TRASK *v.* GREEN.

## William E. Trask v. George B. Green and others.

If the Statute of Uses was ever in force in Michigan, it was repealed by the act of September 16, 1810, repealing the acts of Parliament, &c.; from which date until March 1, 1847, when the Revised Statutes of 1846 took effect, no statute involving the principle of the Statute of Uses was in force here.

A resulting trust in real estate, existing as such prior to the Statutes of 1846, is not subject to attachment or execution.

Such a trust is not executed by the Statutes of 1846.

Where, since the Statutes of 1846, land is purchased by one in the name of another, no trust results to the purchaser, and the trust in favor of creditors can not be enforced by levy and sale on execution.

The statute which subjects to execution "lands fraudulently conveyed with intent to defeat, delay or defraud creditors," does not reach the case of lands bought by the debtor, but conveyed directly to a third person instead of the debtor.

Where an attachment was served on an equitable interest in lands not subject to attachment, and the defendant was not served with the writ, and did not appear in the suit, it was *held* that the attachment creditor could not, by virtue of any judgment and execution in that suit, acquire any lien on the land which equity could enforce in his favor.

*Heard  October 24th  and 25th.  Decided November 19th.*

Appeal in Chancery from Wayne Circuit. The case is fully stated in the opinion.

*Levi Bishop,* for complainant :

It is a familiar principle, that conveyances in this country derive their force and effect from the Statute of Uses, 27 Henry VIII. c. 10. By force of this statute, as embodied in the laws of Michigan by the Revised Statutes of 1846 — which was declaratory of the existing uses, while at the same time providing for such as might be created in the future — Green & Skinner were seized of the land to the use of the Bank, the real owner. The legal seizen and possession were in the Bank, and only the naked form of title in Green & Skinner : 17 *Johns.* 351. This legal seizen and possession were subject to attachment and execution. *Comp. L.* §§ 4747, 3119, 3155 ; *Ibid.* § 9 ; 17 *Johns.* 351. This position does not require us to controvert the general doctrine, that a naked equity can not be

sold on execution,⁵ for here is something more than a mere equity in the land, in favor of creditors of the Bank.

A debtor will not be permitted to place his effects in the hands of others, and by that means bid his creditors defiance : — 20 *Johns.* 564. Either a legal or equitable *seizen* may be sold on execution : 4 *Cow.* 599. Any *estate* within the Statute of Uses : 9 *Cow.* 73, 80. Lands bought and paid for, but not yet conveyed : 1 *Fost.* 347 ; 10 *Conn.* 137 ; 11 *Conn.* 369 ; 1 *Johns. Ch.* 52 ; 17 *Johns.* 351 ; 3 *Johns.* 216 ; 2 *Wend.* 570 ; 4 *Wend.* 462 ; 18 *Wend.* 236 ; 2 *Har. & J.* 301 ; 1 *Dev. & Bat.* 119 ; 3 *Kelly,* 5 ; 5 *S. & M.* 499 ; 3 *Ind.* 129 ; 23 *Mo.* 579, 588 ; *Lalor,* 181 ; 3 *Jones* (*Law*), 537. Equity will even aid a levy where the purchase and equity are not complete : 23 *Mis.* 54.

*C. I. Walker,* for defendants Green & Skinner :

Admitting, for the sake of the argument, that Davis continued to hold the title for the Bank in the same way that Campbell and Rufus Emerson did, still the Bank had no attachable interest in the land. Purely equitable interests are not subject to execution unless by statute : 1 *Greenl. Cruise, tit. xi. c. ii.* § 26 ; *Ibid. tit. xii. ch. ii.* § 37 ; 8 *East,* 469 ; 1 *Paige,* 315 ; 13 *Pet.* 298 ; 2 *Atk.* 292 ; 1 *Ired.* 537 ; 2 *McLean,* 298. Certain trust estates were made subject to execution by statute 29 Charles II, c. 3, § 10, which has been adopted in some of the states by express enactment, but not in force except where specially adopted. See 1 *Greenl. Cruise, tit. xii. c. ii.* § 31, *note ;* 4 *Kent,* 309, *note ;* 3 *Johns.* 216 ; 2 *Wend.* 570 ; 19 *Wend.* 414 ; 5 *Denio,* 223 ; 5 *S. & M.* 506 ; 23 *Mo.* 579 ; 8 *Rich.* (*Law)* 392 ; 2 *Leigh,* 280 ; 3 *T. B. Monr.* 159 ; 2 *Blackf.* 431 ; 3 *Ind.* 129 ; 1 *Yerg.* 1 ; 1 *Hemps.* 491 ; 15 *Ill.* 95 ; 3 *Kelly,* 11. But even then a *mere* equity is not subject to execution : 17 *Johns.* 352 ; 7 *Johns. Ch.* 52 ; 5 *Cow.* 487. Nor, as would seem, any trust unless it is raised by and

described in the conveyance: 1 *Yerg.* 113; 3 *T. B. Monr.* 159. In some States, indeed, equities are subject to execution by the force of a long settled usage, a local common law: 4 *N. H.* 404; 17 *Conn.* 282.

The statute 29 Charles II., c. 3, § 10, was never in force here, but if it had been, would have been repealed by the territorial act of September 16, 1810.

But our Statue of Uses and Trusts, if then in force, would not have helped complainant. Under the statute, had the deed been fraudulent as to creditors, the trust would be raised in favor of the creditor; not to the debtor, or in his favor. There would be no attachable interest in him. 15 *N. Y.* 475. See also, 3 *Jones* (*Law*), 537; 10 *Paige,* 562; 3 *Barb.* 573; 2 *Peck,* 507; 3 *Met.* 26; 1 *Ired.* 553; 2 *Rich.* 624; 15 *Ala.* 412; 16 *Ohio,* 469. The principle of these cases is recognized in 3 *Mich.* 509.

The Statute of Uses of 27 Henry VIII, c. 10, did not operate upon implied trusts resulting from the operation of law: 15 *N. Y.* 477; 5 *Denio,* 225. It did not operate upon parol trusts, except where the conveyance itself might have been by parol, as by feoffment: *Shep. Touch. Ch.* 9, *p.* 213; 1 *Greenl. Cruise, p.* 343, *note;* 7 *Bac. Ab.* 92. But that statute was never in force in Michigan. The Royal proclamation of October 8, 1763, which introduced English law as the law of the land, included only a small portion of French Canada. The Quebec Act of 1774 extended the government of Quebec south to the Ohio, and west to the Mississippi, and restored the French Law: *Quebec papers, by Baron Masseres,* 79, 87; *Cavendish's Debates,* 183 *and Appendix;* 1 *Smith's Hist. of Canada, App.* 48; 1 *Murray's British America,* 180. A new government was formed in 1791, making Michigan a part of Upper Canada, but previous to 1796 there was no radical change in the real estate law. In 1796, the jurisdiction of the Northwest Territory was extended over Michigan, but the Statute of Uses was never in force in that ter-

TRASK v. GREEN.

ritory: 2 *Ohio*, 339; 7 *Ohio*, 295; 23 *Vt.* 609. Nor ever adopted in Michigan Territory or State: — See *Reporters note to Galpin v. Abbott, 6 Mich. 28.*

CHRISTIANCY J.:

Admitting the case made by the bill, can the bill be sustained? If not there is no propriety in discussing the evidence.

Construing the bill in the most favorable light for the complainant, the case is substantially this:

The complainant is a creditor of the Bank of Windsor (in the State of Vermont) which became insolvent in 1838. Thomas Emerson, being largely indebted to the Bank, and being the equitable owner of the undivided half of a farm in the county of Wayne, Michigan, the legal title to which stood in the name of Curtis Emerson and Royal H. Waller, turned out to the Bank, among other property, this equitable interest as security for a part of such indebtedness, giving a bond with sureties, that the property thus turned out should produce to the Bank the sum of twenty thousand dollars. Curtis Emerson and R. H. Waller, soon after (January, 1839) conveyed the legal title to Rufus Emerson and Edward R. Campbell, who were directors and agents of the Bank, but who took in their individual names, and without, so far as appears, any declaration of trust on the face of the deed, or by any written instrument; though the conveyance was in fact made in pursuance of, and for the purpose, of carrying into effect the arrangement made with the Bank by said Thomas Emerson; the effect of the whole being to place in the Bank and Rufus Emerson and Edward R. Campbell, when acting in concert, the power to sell these lands, and apply the proceeds towards the payment of Thomas Emerson's indebtedness.

Afterwards, in a suit brought by Thomas Emerson in Chancery, in the State of Vermont, against the Bank, in

MICH. 9—Y

reference to the securities or property so turned out, Carlos Coolidge was appointed receiver, and these securities were ordered to be sold, in such manner as to secure the interests both of the bank and said Thomas Emerson; but the receiver, on the 13th day of August, 1845, under the direction of, and by collusion with the officers of the Bank, made a pretended sale of the interest of the Bank in these lands to one Reuben Davis, for a very small sum, which, if paid at all, was paid by the Bank; Davis being the agent of the Bank, and taking the receiver's deed in his own name, but really in secret trust for the Bank, and for the purpose of defrauding both Thomas Emerson and the creditors of the Bank. In pursuance of this sale, and to carry it into effect, and with the like fraudulent intent, said Rufus Emerson and Edward R. Campbell, who held the legal title as above mentioned, on the next day conveyed the land to said Davis, thus making Davis the apparent owner, while he in fact took the title only for the benefit and on behalf of the Bank.

The title, so far as it appeared of record, remained in Davis until the recording of his deed to Green & Skinner mentioned below, on the 30th day of July, 1857. In the meantime, on the 27th day of May, 1857, the complainant, for the purpose of enforcing payment of his debt against the Bank, commenced his suit in attachment in the Circuit Court for the county of Wayne, in this State, against the Bank as a foreign corporation, and on the same day caused the land to be seized on the writ of attachment; by which he claims a legal and equitable lien for the payment of the judgment subsequently obtained in the attachment suit.

But, as now appears by the record in the registry of deeds, Davis, by deed dated the 7th day of May, 1857 (before the attachment), conveyed the lands to the defendants Green & Skinner, which deed, however, was not recorded till July 30th, 1857.

TRASK v. GREEN.

Green & Skinner are alleged to have been, at the time of the execution of this deed, the agents and directors of the Bank, and to have taken their deed with full notice of the facts, without the payment of any consideration, and in secret trust for the Bank.

No process in the attachment suit was served upon the Bank, and it never appeared in the cause; but the complainant proceeded to judgment under the attachment law, and on the 28th day of September, 1857, obtained judgment for the sum of $3602.76. Execution has been issued upon this judgment, and a levy made upon the lands.

The complainant files his bill in aid of this execution, insisting that the real title and beneficial interest in the land are vested in the Bank; that the deeds from the receiver to Davis, and from Davis to Green & Skinner, are fraudulent, and operate as a cloud upon the title, which he asks to have removed as an obstacle to the sale; and prays that the premises may be decreed to be sold by the sheriff on the execution, and that the Bank, and Green & Skinner, may be decreed to execute deeds to the purchaser; and for an injunction, &c.

Upon this statement of the case, and admitting all the facts stated in the bill, was the interest of the Bank in these lands subject to be taken upon a writ of attachment; or, in other words, could that interest be seized and sold on execution at law? If not, there being no property attached, and no service of the writ upon the Bank, and no appearance on its behalf, the Circuit Court never acquired jurisdiction of the attachment suit, and there is no judgment to sustain the execution, or to serve as the basis of the present bill.

What then was the nature of the interest of the Bank in this land? The bill does not very clearly show the nature of that interest under the original arrangement with Thomas Emerson, while the title stood in the names of Curtis Emerson and R. H. Waller, or afterwards in the

names of Rufus Emerson and Edward R. Campbell; but the equitable interest seems to have been held by the Bank, and the legal by the trustees, as security, with power in the trustees and the Bank together to sell and apply the proceeds to the debt of Thomas Emerson; and that he was interested in the proper disposition of the lands to reduce the liability of himself and his sureties on their bond of indemnity.

In this condition it seems to have remained until the sale by the receiver to Davis, and the deed from R. Emerson and E. R. Campbell to him in 1845. By this sale, if in good faith, and if Davis paid the consideration, the whole title, legal and equitable, vested in him; but if the sale was merely colorable and fraudulent, for the purpose stated in the bill, it was void as to creditors, and left the equitable interest still in the Bank for the benefit of creditors, but standing merely as it did before the sale; the conveyance of the legal estate operating merely as a change of trustees, and placing Davis in the position previously occupied by R. Emerson and E. R. Campbell. If the Bank paid the whole consideration, and the sale was made to Davis in good faith, to be held for the use of the Bank, it might perhaps have cut off or extinguished all interest of Thomas Emerson; in other words, it might cease to be held merely as security; and, from that time, it might have been held by Davis under a new trust, in the execution of which the Bank alone and its creditors would be interested. But unless the trust was expressed on the face of the deed, or, at least, by some instrument in writing, the interest of the Bank would be merely a resulting trust: — *Rev. Stat. of* 1838, *p.* 261, § 27. And if the sale was made, as alleged in the bill, to defraud creditors, and the only consideration was paid by the Bank, it would still be a resulting trust, and nothing more; and in that event, the subsequent conveyance to Green & Skinner, without consideration and with full notice, and with

the like fraudulent intent, did not change the nature of the interest, but merely substituted them as trustees in the place of Davis; so that, in any view which can be taken of the case, the interest of the Bank never rose to a higher grade than that of a resulting trust, or a trust which the law implies as resulting from the whole transaction.

The complainant's counsel insists — and such is the theory of his bill — that this being a mere naked and passive trust, was executed as a use, and vested in the Bank as a legal estate, by the operation of the Statute of Uses, 27 *Hen. VIII, Ch.* 10, and thus became liable to execution against the Bank, like any other legal estate.

To this there are several conclusive objections:

1st. It does not satisfactorily appear that the English Statute of Uses ever had any operation within the territory now constituting the State of Michigan; and though we do not expressly decide the point, as it is not necessary to the decision of the present case, the authorities cited by the defendants' counsel from the colonial history of Canada, and the decisions of the Ohio courts, for which we refer to his very thorough and elaborate brief, tend strongly, if not conclusively, to show that this statute never was enforced here while the territory remained under the jurisdiction of the British government; and if, subsequent to 1796, when the jurisdiction of the United States was extended over it, the statute, in any way, acquired force here (of which we have seen no evidence), its operation must have ceased on the 16th of September, 1810, when an act was passed (or adopted) by the Governor and Judges, expressly repealing all acts of the British Parliament and of the authorities of Canada: *Cass Code,* 119; *Laws of* 1820, *p,* 460; *Laws of* 1833, *p.* 563.

From the passage of this repealing statute till the Revised Statutes of 1846 took effect, March 1, 1847, there was no statute involving the principle of the Statute of Uses, or

purporting to execute uses or trusts, or to convert them into legal estates: and trusts might be created or held as at common law, except so far as their creation might be affected by the Statute of Frauds, or the Revised Statutes of 1838, already cited, requiring all except resulting or implied trusts to be created or declared by writing.

By section three of chapter 63 of the Revised Statutes of 1846, the principle of the English Statute of Uses was adopted; and it is insisted by complainant's counsel, that the preceding section (two) which provides that "every estate which is now held as an use executed under the laws of this State, as they formerly existed, is confirmed as a legal estate," is a legislative recognition of the fact that such a law had previously existed here. But if this were true, the statute could not so operate upon the past as to give a previous existence to a law which had not existed in fact; and if it had previously existed, it needed no such recognition. But I think it is fair to say that the statute does not undertake to determine the former state of the law, but, in effect, merely to provide for the confirmation of any such uses as legal estates, provided there had been any such prior law. The question whether a law has formerly existed, is not one for legislative but judicial cognizance.

But the insertion of this section (2) in this chapter may be accounted for on a very obvious hypothesis. The whole chapter is copied almost literally from the Revised Statutes of New York (*Vol.* 1, *Tit.* 2, *part* 2, *Ch.* 2, *art* 2, § 46) in which the provision is found, in the same words, with the difference only that the reference there is to "any former statute of this State."

This language was entirely proper there, where they had adopted the Statute of Uses at an early day; but our Legislature, or the Revisor, finding no former statute on the subject, thought it better to refer to the "laws as they formerly existed," so as to meet any previous state of

the law, on the principle that if it would do no good it could do no harm.

But *secondly:* Had the Statute of Uses been in full operation here at the time of these several conveyances, it would not have affected the present case: as that statute never operated upon mere resulting trusts, or trusts arising by operation or implication of law, but only upon those express trusts actually created by the parties: *Garfield v. Hatmaker*, 15 *N. Y.* 477; *Moore v. Spelman*, 5 *Denio*, 225. Nor did it apply to or execute trusts created by parol, except in those cases where the conveyance of the legal estate might be by parol, as by feoffment: — *Shep. Touch. Ch.* 9, *p.* 213; 7 *Bacon's Abr.* 92; 1 *Greenl. Cruise, Tit. xi, Ch.* 2, *note to* § 29, *and authorities there cited.*

We are next to inquire whether this trust was converted into a legal estate by Chap. 63 of the Revised Statutes of 1846 (*Ch.* 86 *Comp. L.*). Section three of this chapter enacts: "Every person who, by virtue of any grant, assignment or devise, now is or hereafter shall be, entitled to the actual possession of lands and the receipt of the rents and profits thereof, in law or in equity, shall be deemed to have a legal estate therein of the same quality and duration, and subject to the same conditions as his beneficial interest."

But if the language of this section were broad enough to include resulting trusts, it can have no such effect, since it is expressly provided by the 6th section, that " the preceding sections of this chapter shall not extend to trusts arising or resulting by implication of law."

And if the deed to Green & Skinner, which was made since this statute, is to be treated as a grant for a valuable consideration paid by the Bank; then, so far from this statute executing the trust as a use, not even a trust resulted in favor of the Bank (§ 7); but, unless a fraudulent intent were disproved, the trust would result directly to the creditors, under the provisions of the 8th section : See *Garfield v. Hatmaker*, above cited.

Where the title before the conveyance has been vested in the debtor himself, and he has conveyed for the purpose of defrauding his creditors, the right of creditors to levy and sell rests upon the ground, that the deed being void as to creditors, the legal title, as to them, still remains in the debtor, as if no conveyance had been made. The land may therefore be sold on execution at law, without invoking the aid of a court of equity; and the purchaser may, if he chooses, try the question of fraud in an action at law: — *Cleland v. Taylor*, 3 *Mich.* 201 *and cases cited;* and he may, doubtless, file his bill in a proper case, after sale, to remove the cloud created by the fraudulent conveyance. But it is generally more advantageous to all parties, and therefore more common, for the creditor to bring his bill before sale, in aid of the execution. And this may be done at any time after the creditor has obtained a lien upon the land by his judgment, when that, of itself, creates the lien, or only after the levy of an execution, where, as in this State, the levy is necessary to give the lien.

But if the title has never been in the debtor, and the fraudulent conveyance has been made by some other person on a secret trust for the benefit of the debtor, the setting aside of the fraudulent deed would still leave the title out of the debtor, as much as if the deed had been valid; the only difference being, that there is a different trustee.

We are therefore all clearly of opinion that neither the attachment on which the complainant's judgment is based, nor his execution, could be levied upon the interest of the Bank, as a legal estate in the land.

Was it, then, subject to levy and sale on execution at law as a trust?

In England, under the Statute of Frauds, 29 Ch. II, c. 3, Sec. 10, trusts of the debtor in real estate might be seized on execution, and the possession of the lands de-

livered to the creditor; for no sale of lands was there made on execution. But this provision is said not to have extended to the colonies, and several of the states have never adopted it: See 1 *Greenl. Cruise, Tit. xii, ch. 2 note to* § 31, *and authorities there cited.* This statute, or one of similar operation, has been adopted in several of the states, and in most cases extended to the sale of the land subject to the trust. These statutes constitute the basis of most of the decisions cited by complainant's counsel as tending to show that the trust was recognized as a legal estate. In most of these decisions the statute is expressly referred to:— See *Foote v. Colvin,* 3 *Johns.* 216; *Jackson v. Bateman,* 2 *Wend.* 570; *Pitts v. McWhorter,* 3 *Kelley,* 5; *Thompson v. Wheatley,* 5 *S. & M.* 499; *Goodwin v. Anderson,* 5 *S. & M.* 730; *Hall v. Harris,* 3 *Ired. Eq.* 289. In other cases where the operation of the statute had rendered the principle familiar, general language is adopted without referring to the statute.

We have no such statute in this State, though it has been insisted that the clause "including lands fraudulently conveyed, with intent to defeat, delay or defraud creditors" — *Sec.* 1 *of Chap.* 70 *Rev. Stat. of* 1846; *Comp. L.* § 3119 — has the effect to render trusts in lands liable to execution; but, when the whole section, and especially the whole chapter is construed together, we think it is not susceptible of this construction.

The whole section is in these words, "The real estate of the debtor, whether in possession, reversion or remainder, including lands fraudulently conveyed, with intent to defeat, delay or defraud his creditors, and the equities and rights to redemption hereinafter mentioned, shall be subject to the payment of his debts, and may be sold on execution, as hereinafter provided." We think the "real estate of the debtor" here intended is the legal estate, and not a mere equity or trust. And this is rendered the more clear by the fact that it specially provides for "the equi-

ties and rights of redemption hereinafter mentioned." The
only equities or rights of redemption mentioned in the sub-
sequent portion of the chapter, are the rights to redeem
mortgaged real estate sold on execution. Now the right
of the debtor himself and his heirs and assigns to redeem
land sold on execution is clearly a legal estate, as by the
express provision of the statute his title is not divested
till the fifteen months (the period for redemption) has ex-
pired — *See* 30 *of this chapter* — and the right of the mort-
gagor and his heirs and assigns to redeem is also, I think,
the legal estate, his title not being divested until the time
for redemption expires: it is only when some creditor of
the execution debtor, or some person other than the mort-
gagor, having some interest in or encumbrance upon the
mortgaged property, seeks to redeem, that the right can be
viewed in the light of an equity. But whatever may be
the extent of the " equities and rights of redemption" here
mentioned, the fact that these are specifically mentioned as
made liable to execution cuts off all inference that any
other *equities*, and more especially mere resulting or implied
trusts, were intended to be included, without being men-
tioned at all. We can therefore have no doubt that the
fraudulent conveyances in this section referred to, are those
made by the debtor himself.

In some States, where judgments constitute a lien on
real estate, it has been held that a creditor has, by his judg-
ment, a lien on the equitable estate of the debtor, in like
manner as at law on his legal estate: — *Coutts v. Walker*,
2 *Leigh*, 268; *McNairy v. Eastland*, 10 *Yerg.* 310; *Chap-
ron v. Cassady*, 3 *Humph.* 661; *and see Godbold v. Lam-
bert*, 8 *Rich. Eq.* 162: and upon the like principle, if correct,
it may be difficult to see why the levy of an execution on
the land subject to the trust, when judgments are not a
lien, would not equally give an equitable lien: — See *Story
Eq. Jur.* § 1216.

Had the Bank been served with process, or appeared in

the attachment suit, the judgment would have been binding upon the Bank generally, independent of the seizure of the property attached; and it might then have been important to discuss the principle which seems to have been recognized by these authorities; but as the equitable lien upon the trust under these authorities is purely a creature of equity, and the equitable interest can not be sold on the execution, nor reached without the aid of a court of equity, and this aid is only afforded after a valid judgment has been obtained at law, it is quite evident the principle recognized in these authorities can have no application to the present case. The aid of the judgment can not be invoked to sustain the service of the writ when, without the service, there could be no judgment.

The decree of the court below, dismissing the bill, must be affirmed.

MARTIN CH. J. concurred.

CAMPBELL J.:

I concur in the opinion of my brother Christiancy upon the points decided, and in his reasoning. The last point referred to being before us in the case of *Maynard v. Hoskins*, my views upon it will be expressed in the opinion of the Court.

MANNING J. concurred.