TAYLOR v. BOARDMAN.

# Charles W. Taylor v. Francis D. Boardman and another.

*Attorney-at-law dealing with those not clients.*   An attorney-at-law stands on the same footing with others, in dealing with persons who are not, and have not been, his clients within such a period as might raise a presumption that he is dealt with as a professional adviser.

An attorney, not occupying such a relation, went to complainant, whose property had been sold on execution, so that his right of redemption had expired, and none but creditors could redeem, and proposed, if complainant would confess judgment in his favor upon a certain alleged claim, that he would redeem the property for complainant's benefit on reasonable terms of compensation; but complainant refused to do so: ——

*Held,* That a subsequent purchase by the attorney of an outstanding judgment and a redemption under it, gave no rights to complainant in the redeemed property.

*Husband and wife.*   A subsequent sale of the redeemed property to the wife of complainant, in consideration of a mortgage given back in an amount not much exceeding the sum required to redeem and clear the property from encumbrances, upon an agreement to clear the title, enured solely to her benefit, and gave complainant no interest, and no right to complain of non-compliance; and created no duty in regard to any property not included in that arrangement.

*Statute of frauds.*   A verbal promise to advance money, and make purchases therewith for another, and hold and dispose of the property for his benefit, where he furnishes no means, and when nothing is obtained by his aid or from his property, would be (if established,—which is not found to be the case here) void under the statute of frauds.

*Purchaser under execution: Trustee.*   Where a debtor is, by carelessness and bad habits, allowing his property to be sold on execution, and does not redeem it, a person who buys it up from the execution creditors does not become a trustee for his benefit; even where the purchaser gives out that he has benevolent designs in his favor, where he gets no deductions in price on the idea that he is such trustee, and where he has not fraudulently intervened to prevent the debtor from getting what he would have obtained without such intervention.

*Fiduciary relations.*   Upon the facts in this case, it was found there was no manner of fiduciary relation between complainant and defendants.

*Rehearing.*   An application for a rehearing, based upon a showing of facts that were already upon the record, or that would not materially alter or add to the case made on the first hearing, will be denied.

*Heard January 5 and 6.    Decided April 3.*

Appeal in Chancery from Kent Circuit.

*Andrew T. McReynolds* and *Alfred Russell,* for complainant.

*E. S. Eggleston* and *Jacob Ferris,* for defendant Boardman; *Charles C. Rood,* in person, and *Isaac H. Parish* and *D. Darwin Hughes,* for defendant Rood.

CAMPBELL, J.

The bill in this cause was filed to enforce a trust or agreement under which Boardman was alleged to have become invested by redemption and otherwise, with the title to several parcels of land which had been sold under legal process against complainant, and with refusing to recognize or carry out his obligation to restore the titles to complainant upon the refunding of the moneys expended in the purchases and redemptions, with all proper allowances for services. The supplemental bill was intended to reach part of the same premises which had been bid off under a mortgage from complainant and wife to Rood, but which for reasons there set out were claimed to belong to complainant under similar equities involving a right to have the property restored on a just accounting and remuneration.

The record is too voluminous to admit of a full statement of all the facts proven. It will be more satisfactory to give a sufficient statement of our conclusions from the pleadings and testimony, as the substantial merits on both sides rest on familiar principles of equity. It is unfortunate that there is on several matters a direct conflict in the proofs. The case, however, furnishes adequate means, as we think, for a correct decision.

The bill shows as the origin of the transactions under consideration that in the early part of the year 1862, a very large and valuable property of the complainant had been sold on judgments against him; and that these sales had been made for the most part in January and May 1861. Other sales were made in the year 1862, after the arrangement set up in the bill is charged to have been made, and defendant Boardman is now claimed to have obtained these as well as the earlier titles under that arrangement. There

was at the time the transactions began, a judgment in favor of Buhl & Ducharme of Detroit for a little less than two hundred dollars, on which no execution had been sued out.

In February 1862, when the complainant's right of redemption had expired on the January sales, and when none but judgment creditors could redeem from them, the bill charges that Boardman, who had been complainant's "attorney in various matters," and with whom complainant "had consulted respecting his embarrassments, and as to the most feasible means of raising money to relieve himself therefrom" came to complainant's residence and told him "he had been considering his affairs, and had, in his own mind, fixed upon a plan by which he could aid your orator and assist him to recover his property which had been sold, and to enable him to realize means with which to disembarrass himself; and spoke of the sales of your orator's property under the Eggleston and other executions, on the 19th day of January, 1861, and of the fact that the time allowed by law for your orator to redeem the premises sold under the said executions, had then expired; but said that if he had a judgment against your orator he could still redeem the property sold, as a judgment creditor, and that he would give your orator the benefit of such redemptions, and proposed to your orator to confess a judgment in his favor, saying that he could redeem the said property of your orator which had been sold as aforesaid, and that he would do so, and raise and advance the necessary means for that purpose, giving to your orator the benefit of such redemptions, requiring only that your orator should refund the money advanced, with interest, and a reasonable compensation for such time as he should expend in that business." Complainant alleges that he declined to give any such confession because he owed him nothing and it would

24 MICH.—37.

be in fraud of creditors, but told him of the Buhl & Ducharme judgment and that there were also others attainable.

It is not alleged that any agreement or understanding was had at this time, but the bill avers that shortly afterwards complainant "learned from the said Boardman that he had procured the said Buhl & Ducharme judgment, and that it was assigned to him, and that he would raise the necessary means to redeem your orator's property, and would give your orator the benefit thereof as aforesaid."

To avoid confusion it is important to keep the various transactions distinct. Up to this time the bill shows that the redemptions contemplated, were those upon sales made in January, 1861, and that no distinct agreement was made, either before or after the purchase of the Buhl & Ducharme judgment, beyond a mere statement by Boardman, of his intentions in complainant's favor, based upon no consideration and not charged as a specific contract. This portion of the case is rested by the bill and argument upon obligations arising out of confidential relations. The sales made in January, 1861, were of twenty-eight feet of lot one, in section two of the Grand Rapids plat (better known as the "store" property), and also of several parcels on what is described as "Tanner Taylor's addition,"—a plat laid out by complainant, who was in the tanning business. The store lot was bid off on a judgment in favor of E. S. Eggleston, administrator of Henry R. Williams, to Peter R. L. Pierce, and also on a judgment in favor of Pratt & Beals, to those plaintiffs. This store lot had also been sold on a subsequent execution, in May, 1861, on two judgments, one in favor of Ball & Hollister, and one in favor of Butterworth; and it had been levied on under an execution in favor of the bank of Lansingburg, but not yet sold. The

property on Tanner Taylor's addition, sold on a judgment in favor of Giddings & Latimer, was in part, but not all of it, sold under later executions, in May, 1861.

The time for judgment creditors to redeem under the January sales, expired April 19, 1862. The bill states that Boardman on that day attempted to redeem under the Eggleston sale and under the Giddings & Latimer sale, and paid the proper sums to the register of deeds, but avers that the bank of Lansingburg had, at an earlier hour, redeemed under the Eggleston and Pratt & Beals sales of the store lot; that the day after the redemption Boardman told complainant and his wife that he had redeemed the property by paying, in addition to the amount of the Buhl & Ducharme judgment, about nine hundred dollars; that the Lansingburg claim might hold some of the property, and especially the store lot, to the amount of about two thousand dollars more, and that it would require an advance of about three thousand dollars to meet the demands against the property which he had redeemed; and he proposed to convey the redeemed property to Mrs. Taylor (complainant's wife), and take back a mortgage for four thousand two hundred dollars, payable in five years with interest at ten per cent., payable annually, representing that he could sell or hypothecate this mortgage to reimburse his advances and raise money to pay off the other encumbrances; that the conveyance and mortgage were made, and by sale or hypothecation of the mortgage, and by raising money on other property of complainant, Boardman got an assignment of the Lansingburg claim, which, instead of canceling, he claims to enforce for his own benefit, and has issued execution to collect it; and that he also got from the bank a transfer of its redemption certificate of the store lot, and purchased from Ball & Hollister their right to the same lot, for eighty-six dollars.

The bill proceeds to state that Boardman claims all these purchases and redemptions as his own; that but for Boardman's promise, complainant would have raised the means from other sources, and that most of the persons who had purchased the lands were willing to give him further time to redeem; that by means of these redemptions and the mortgage, complainant's most valuable property went under Boardman's control, and complainant was unable to raise money or manage his affairs; and that Boardman never pretended to claim in his own right until after he had got the mortgage and made the redemptions.

The case made by the bill may then be stated in brief as depending on these showings: *First*, previous confidences; *second*, a conveyance of property redeemed, to Mrs. Taylor, and a mortgage back for four thousand two hundred dollars, which was to be used to furnish means to reimburse moneys already paid, and to raise further moneys to clear off the liens on the same property, to redeem the Lansingburg bank deficit, which would, as supposed, cover this property, and to pay a judgment in favor of Charles C. Rood, where the redemption had not yet run out. This covers the whole scope of the original bill, and a fair compensation was to be deducted.

From the proceedings afterwards had, and especially in view of the great conflict of testimony, it is to be noted that until the supplemental bill was filed, no claim was set up in the pleadings that any trust had arisen beyond one, for the protection of the property conveyed to Mrs. Taylor, unless the Lansingburg decree and the Rood judgment were contemplated as important on other grounds,—upon which the bill is silent. There is no averment that Boardman was to redeem any of the property not sold in January, 1861, nor that he was to purchase any other, nor that he was to furnish any means beyond what could be raised by sale or hypothecation of the mortgage.

Boardman's answer denied any confidential relations or agreements, and sets up that the transaction with Mrs. Taylor was a sale on fair terms of property he had, or was supposed to have, acquired by due process of law.

The decree on the original bill held Boardman a trustee for all the property acquired or redeemed by him from executions, decrees and all other sources of title whatsoever.

Before this decree had been carried out into a settlement of accounts a supplemental bill was filed against Boardman and Rood, which, after stating the purport of the original bill, set up substantially the following claim:

It averred that Rood owned and controlled the executions and purchases made under them, on which sales were had in May, 1861; that Rood, before the redemption expired, proposed to furnish complainant money to redeem a parcel known as part of lot three (containing a valuable tannery), if complainant and his wife would secure the advances by mortgage, covering (in addition to this and some other property sold under the same executions) complainant's adjoining homestead, on lot three, which had not been levied on; and this arrangement was carried out on both sides, May 3, 1862, the mortgage being for nine hundred and fifteen dollars and seventy-five cents, the amount of the advance and some small charges for other matters; that under the Lansingburg decree, execution had been levied in 1861, on the tannery property, and in October, 1862, it was sold to Boardman for twenty-one hundred dollars, and this sale became absolute, and he received a conveyance which cut off Rood's mortgage on that parcel, and that Boardman owned the decree when the sale was made, but as claimed in the bill in trust for complainant; that about the time the original bill was filed, Boardman negotiated with Rood to buy his mortgage or the forclosure decree on it, and gave an unrecorded mortgage on the premises secured

by it to Rood; that before the suit was begun Boardman obtained complainant's written consent that Rood might assign the security—the latter refusing to do so without such consent; that, believing Boardman would include this in his accounting with complainant, and complainant having been prevented by Boardman's execution sale under the Lansingburg decree from having any property or means to redeem the mortgage, he was compelled to let the property be sold on the Rood foreclosure; and that a deficiency arose on that sale for which they threaten to sue out execution and levy on complainant's property in Boardman's hands; that now they claim Boardman has no rights, and that Rood is the real owner and always has been, and intends to move for a writ of assistance, and that such a writ had been previously got out by Boardman in Rood's name irregularly, but the service was prevented and the writ canceled. Collusion is charged between Rood and Boardman to defraud complainant, and various pretenses are set forth which need not be detailed.

Issue being taken upon the material allegations, and proofs introduced, a decree was made assuring to the complainant the entire property in controversy, upon payment of a sum settled by accounting. Defendants both appeal.

As this case was presented on the argument, many of the equities, and all of them, in certain points of view, were based upon an alleged confidential relation of counsel and client, dating back of all the transactions, and making it wrong for Boardman to obtain or hold any of the property of Taylor against his wishes.

There is no evidence in the case sustaining such an inference. The relation had not existed for some years, and Boardman had given up professional business. The only connection between him and Taylor within a considerable time previously must be inferred

from the testimony of Mrs. Taylor and a letter on page 654 of the case from the bank of Lansingburg to Boardman, dated (as printed) January 30, 1862, and referring to previous offers made to Mr. Taylor for the sale of their claims. This letter appears, from the date of those offers, as well as from other evidence in the cause, to have been written July 30, 1862, just before Boardman purchased the interests of the bank. Mrs. Taylor swears simply to having asked Mr. Boardman, in the winter of 1861-2, how Mr. Taylor's affairs were getting on,—supposing, as she says, that Boardman knew all about them,—but he informed her he had no knowledge on the subject. Taylor does not testify to any previous relations between them, and says Boardman, when he made his application, said Mrs. Taylor had spoken to him and wanted him to see if he couldn't take hold and settle up his business and save his property. This is denied by Boardman and not sustained by Mrs. Taylor.

We have, then, as a starting point in the investigation, the fact that the interview was sought by Boardman and not by Taylor, and that there had been no previous dealings which rendered it Boardman's duty, legal or moral, to take any steps for Taylor's benefit. And we have the further fact that Taylor had then no interest, legal or equitable, in the lands which had been sold and not redeemed, while any creditor of Taylor's might redeem for his own benefit.

All parties agree that Boardman informed Taylor that his own rights were gone and none but a creditor could redeem; and they agree that Boardman asked, and Taylor refused, a judgment in Boardman's favor to enable him to redeem, whether the redemption was to be for his or for Taylor's benefit. They agree, also, and the bill so shows, that the failure to give the judgment was the end of this first conversation at which no agreement is pretended to have taken

place.    Boardman then purchased the Buhl & Ducharme judgment with his own money, and redeemed, or supposed he redeemed, with his own money, the property sold in January 1861, a part of which, however, is claimed to have been anticipated by the Lansingburg bank.    There was at this time no reason why he should not retain the property to his own use; it legally and equitably belonged to him.

Having redeemed, a subsequent interview was had with Taylor which resulted in a quit-claim to Mrs. Taylor of the redeemed property and a mortgage back for the whole consideration of four thousand two hundred dollars,—nothing being paid down.    All the equities arising on the original bill depend on this transaction.    Boardman claims that it was a sale on credit, he having a right, by a separate instrument, to collect rents and retain enough for the interest on this specific sum and insurance and taxes; while it is claimed on the argument for Taylor that it was part of a general agreement to clear up his property.    The principal inquiry which we have to make concerning it is whether the agreement, whatever may have been its nature, extended beyond the protection of the mortgaged property.

The bill, fairly construed, confines all the negotiations before and immediately after the redemption, including the conveyance and mortgage, to the lands which Taylor had lost the right to redeem and which could only be saved by the interposition of some one else as a judgment creditor. Taylor's testimony is still more explicit, as he shows Boardman represented the claims against the store lot (including what he had paid out to redeem that and the other property redeemed), as about four thousand dollars, and that the mortgage was given for two hundred dollars more, and Boardman agreed to clear up the property with the avails of

it. The fact that he was only allowed to retain interest on this precise sum out of the rents, is also significant upon the subject.

Taylor's conduct afterwards can only be explained on this theory. The next and only other redemptions to be made thereafter, were those under the Rood judgment and the others controlled by him. These redemptions could be made by Taylor himself up to May 4. Instead of asking Boardman to redeem these, or waiting to have him do so, Taylor applied personally to Rood to obtain means to redeem, and did so redeem, giving Rood a mortgage on his homestead and other clear property as well as on the redeemed property. And Mr. Rood testifies to an anxiety in Taylor to prevent Boardman from acquiring any hold upon it; while other witnesses testify to an habitual distrust of Boardman at this time as wishing to rob Taylor of his property. This testimony covers a time before as well as after the first redemption made by Boardman, and before any business dealings were consummated.

If this is the fact, and the bill and evidence seem to agree upon it, then all the equitable duties Boardman had undertaken—assuming the agreement to be valid and established—were confined to making good the title to the property conveyed to Mrs. Taylor, and outside of this he could not be a trustee.

This disposes of the whole original bill. Complainant had no right to complain of any frauds relating to that matter. They concerned his wife and not himself. If he had such a relation to the papers as to render it proper to join him as a co-complainant, he had no right to sue alone. That bill should have been dismissed.

The equities of the supplemental bill all hinge on the Rood mortgage, and Boardman's connection with it. They are substantially that Boardman got complainant's consent

24 mich.—38

that Rood should transfer it to him, and that afterwards, in order to avoid the trust, it was collusively maintained in Rood's name, but for Boardman's benefit, to defraud complainant. The supplemental bill does not refer to the Lansingburg bank matters, except so far as connected with these dealings. But so much was said on the argument about them that they may need some explanation.

The Lansingburg bank had foreclosed a mortgage against Taylor on property not included in this controversy, and a deficiency remained of something less than two thousand dollars. Execution was issued and levied in June, 1861, on the store lot, the tannery and several other parcels. In April, 1862, in order to protect their claim on the store lot, they redeemed it at an earlier hour than Boardman, and this redemption title they conveyed to one Bryan. Their remaining interest they sold to Boardman in August, 1862, and he afterwards had a sale made under the execution whereby he obtained title among other things to the tannery lot, which it is alleged was prior in law to Rood's mortgage. The complainant's interest in these bank purchases and other property is, in the supplemental bill, rested on the original bill and its averments, which were all dependent on the confidential relations therein set up. Under the supplemental bill, however, considerable proof is given of statements and promises of Boardman, indicating a contract.

There is no foundation for any claim of fiduciary relations between Rood and complainant. Rood took a mortgage for money actually advanced to an ordinary borrower. For reasons arising out of the intemperate habits of Taylor and a kind feeling towards his family, Rood expected and desired that some one might ultimately purchase his mortgage for Taylor's benefit, and was disposed to favor him; but there was no contract to that effect, and

no consideration for one. In the summer of 1862 Boardman tried to get the mortgage from Rood, but he refused to sell it to him without complainant's consent unless he would agree in writing to use it for complainant's benefit; which he refused. Boardman obtained the consent but Rood refused to sell it to him, and no arrangement was made between Rood and Boardman until shortly before the supplemental bill was filed. Complainant's consent was not then regarded, and formed no part of the transaction; and it never was required except because Rood wished to protect his family against unfriendly persons, and it did not convince him that Boardman was friendly. He had a right, so far as complainant was concerned, to deal as he chose with his own securities. If Rood is responsible, it can only be through equities against Boardman, to which he has by his course of dealing subjected himself.

The question then arises whether Boardman ever bound himself by contract or by actual or constructive fraud to hold his purchases for complainant.

No one can read the testimony without receiving a strong impression that Boardman designedly and repeatedly induced many persons to believe that his transactions were intended to benefit Taylor. The statements are vague and do not in any instance refer to any absolute obligation, and yet they were in some instances well calculated to indicate there might be one. There is, however, no evidence anywhere to show that he ever induced any one to believe he had bound himself to make any purchases or advances. The testimony refers more directly to what he had already obtained. The strongest inferential testimony connected with any actual transaction is the correspondence with the Lansingburg bank, where all the early letters would indicate that the bank supposed him to be inquiring on Taylor's behalf. It is not clear how this

impression was first changed, but it was afterwards certain that Taylor repudiated his agency and the bank dealt directly with Taylor thereafter until he had forfeited his right to take up either of the propositions made to him. Boardman was then informed that the offers were no longer open, and that a sale would be made to another person for cash, when he went down and closed a bargain personally in his own name. It was claimed that he intercepted and suppressed the bank's letters to Taylor, but there is no proof to warrant this charge.

There is no evidence that any of complainant's means were used to make any of these purchases. On the contrary, complainant testifies that he repeatedly declined taking measures to put Boardman in funds, because, as he represents, he wanted Boardman to advance the money and wait for its repayment until the settlement of his accounts. He neither gave him money nor lands nor securities to dispose of.

Neither does it appear that Boardman in any case deprived him of what belonged to him, or prevented him by any fraudulent intervention from getting what he would otherwise have obtained, or by getting any deduction in price, because he was supposed to be buying for Taylor. If Boardman had not purchased as he did, the titles of Taylor would have been none the less divested and controlled by other persons, who were not obliged to release to Taylor on any terms. The chance of their unselfishness is not a sufficient foundation for a court to act upon. If Boardman was not legally bound to account to Taylor, then his own offers could not be regarded as unreasonable or oppressive, for while he asked an advance of ten thousand dollars or thereabouts on an outlay of not far from that sum, Taylor would have made a still larger percentage had he bought at that advanced rate.

We are compelled to consider the simple question, whether

there was any binding contract. If there was one, we must be informed just what it was; and Taylor must know all about it. The utmost that can be drawn from any part of the complainant's testimony is, that Boardman promised or made representations of an intention to make advances and save Taylor's property for him. The most direct and intelligible statement is that describing the interview when consent was obtained to have Rood assign his mortgage. This is relied upon as evidence of the making of the contract, and all of Taylor's versions of it negative any previous binding agreement. The statement is substantially that Boardman called on Taylor at Shear's saloon or tavern, and told him he had an arrangement by which he could raise money to buy up all the claims against him. Taylor asked if he was certain he could get the money. He said he was; and that he could get all the claims but one (Rood's), which he could only get by an order from Taylor; that he would take them all up and make one debt of it if Taylor would pay him reasonably for his services, which Taylor said he would do. There is much in the various statements of this interview which it is not easy to reconcile with the other facts, or with the other representations and claims of Taylor. It falls very far short of the certainty which a contract of that importance would be likely to assume. Boardman would not have been likely to make an agreement involving large personal liabilities and sacrifices without retaining some control over his own compensation, or else having such an understanding of it as would prevent the necessity of litigating with a confessedly suspicious and obstinate man to ascertain it. Taylor was at the time under the influence of intoxicating drink to some extent, and on each version he added to the circumstances and changed the surroundings somewhat; but this is the strongest showing of the

agreement.   If we give full credit to Taylor, and leave Boardman's equally strong denials out of view, it will be hard to make a definite contract out of the transaction.

But were it to be so considered, it is liable to the fatal objection that it is an attempt to create a trust in lands thereafter to be acquired at Boardman's expense, by a naked parol agreement.   This is a plain violation of the statute of frauds.   Such a contract, where every thing is to be done one side in advance of any payment or accounting on the other, could hardly admit of any part performance by Taylor to take it out of the statute, as he had nothing to do but pay money when Boardman had completed his part. But no attempt is made to show that any thing was ever done by Taylor thereafter to further Boardman's efforts, and therefore this point need not be considered.   There is no element in the case to relieve it from the statutory disability.

The utmost that can be said in favor of the complainant is, that while he was by carelessness and unsteady habits letting his estate slip away from him, Boardman, seeing the prospects, partly, perhaps, with a vague design to be liberal in the future, and partly to remove the odium which always attends the absorption of one man's property by another, by means however legal, let it be understood that he meant to act so as to ultimately prevent Taylor's pecuniary ruin.   It is plain that Taylor never considered himself as safe, or regarded Boardman as acting as his friend.   The prevailing tone of his statements was that they were acting in hostility.   Taylor's intemperate habits at that time explain reasonably enough how he held inconsistent views, and also would naturally induce him to exaggerated interpretations of Boardman's acts and statements favorable, as well as unfavorable, to his wishes.   There is not much reason to believe that his estate would have been saved under any circumstances.

But whether this be so or not, we think he has failed to make out any case for relief in a court of justice. Boardman is not shown to have violated any of his rights.

The decree should be reversed and the bill dismissed, with costs of both courts.

The other Justices concurred.

---

Subsequently (April 23, 1872), the complainant moved for a rehearing on grounds stated in the opinion.

*Alfred Russell,* for the motion.

*Andrew T. McReynolds, contra.*

PER CURIAM.

An application is made for a rehearing of this cause, based upon a showing of two documents, one being a lease executed by Boardman signing himself as attorney of Taylor, and demising certain premises known in the previous proceedings in this cause as the store lot; and the other being the original deed from Boardman to Mrs. Taylor, set forth in the bill of complaint.

The lease is relied upon as showing that Boardman at the date of it, was acting for Taylor in the capacity claimed on the hearing, and is supposed to furnish important evidence to sustain complainant's theory of the case. But we cannot perceive its materiality. Boardman had by Taylor's consent and authority conveyed the premises to Mrs. Taylor, and had taken back a mortgage. By written agreement signed by Mr. and Mrs. Taylor he was put in possession of the property covered by the lease, and empowered to let it in his own name, or in Taylor's or in Mrs.

Taylor's, his powers being plenary, but the purposes to which the rent was to be applied being specified. The money's might lawfully have been paid to Taylor under the agreement. Holding in this way, it would not have been important how he professed to act, for as between himself and Mr. and Mrs. Taylor there was no room for mistake. The whole arrangement under which he acted in leasing was documentary, and signed by all three, and the lease was in harmony with it.

The deed is precisely as set forth in the bill, and the bill and its equities all rest upon it, and the transactions connected with it. The original bill does not purport to cover any thing independent of it. The claim now set up is, that complainant had forgotten that this deed covered between fifty and sixty lots in Tanner Taylor's addition to Grand Rapids, and never recalled the fact until he had his attention called to this paper after our *decision*. As his bill sets forth under oath the same deed, and describes all the land, and that showing has been the basis of all the litigation, his personal forgetfulness of the fact cannot affect the case which has been tried throughout on that issue. And the description of lands in the deed has no very important bearing on the legal questions involved. The deed, whether covering more or less property, was made to his wife with his assent, and under our statutes no trust could result in his favor, whatever might have been the consideration of the grant.—*Comp. L.*, § *2637*. These lands belonged to Mrs. Taylor, and he had no rights in them whatever. And so far as this motion is concerned, the facts disclosed here would not change the case in his favor or in hers. They were already on the record as fully as they would be if this original deed had been made an exhibit.

The motion discloses nothing new. Leaving out of view all questions of form, and of diligence, we discover no grounds on which we could reasonably act in disturbing the case. The motion must be denied.