THE PRESIDENT, DIRECTORS AND COMPANY OF THE BANK OF MICHIGAN v. JOHNSON NILES.

Where, by the charter of a bank, it was provided that it should be capable of purchasing, holding, and conveying real estate for its use, but that the real estate which it should be lawful for the corporation to *hold*, should be only such as was required for its accommodation in relation to the convenient transaction of its business, or such as might have been *bona fide* mortgaged to it by way of security, or conveyed to it in satisfaction of its debts previously contracted in the course of its dealings, or purchased at sales upon judgments which might have been obtained for such debts, *Held*, that the bank had no right to purchase lands for the purpose of selling them again; and that a contract entered into for that purpose was unlawful, and courts would not aid either party to enforce it against the other.

APPEAL from the Court of Chancery. (*Vide* S. C. Walk. Ch. R. 99.)

The complainants filed their bill in the Court of Chancery, to obtain the specific performance of a contract, entered into between them and the defendant, July 1st, 1839. The complainants thereby bound themselves, within sixty days thereafter, to convey to the defendant certain real estate described in the contract, and to obtain from one Jeremiah H. Pierson, a good and sufficient deed of the property called the Rochester mill property, and convey to him three undivided fourth parts of it; and, in case a mortgage or incumbrance should be created for the purchase money of the mill property, they covenanted to pay the same, and have it released within five years from the date of the contract. They further agreed to deliver to defendant certain certificates signed by him, amounting to $796.63. The defendant, on his part, agreed to execute a mortgage to the complainants for the purchase money to be paid by him, amounting to $28,000, and to include, in addition, in the securities, certain notes, and the amount of the above mentioned certificates. The mortgage was to be executed on the property conveyed to him,

and upon the remaining interest which he already possessed in it, as tenant in common.

Within the sixty days, the complainants purchased and obtained a deed for the mill property of Pierson, for $5,000, which they paid and secured to be paid to him. They then made out and executed a deed to the defendant for three-fourths of it, together with the other property they were bound by the contract to convey to him, and were ready and willing to perform their part of the contract.

The defendant demurred; and, the Chancellor having sustained the demurrer, the complainants appealed.

*J. F. Joy*, for complainants.

*A. D. Fraser*, for defendant.

FELCH, J. delivered the opinion of the Court.

It is claimed on the part of the defendant, that the contract set forth in the bill was such as it was not competent for the complainants, under their charter, to make; that the buying and selling of real estate, except in the cases specified in their charter, is not within the scope of their corporate powers, and is unlawful; and that, the performance of this contract involving a violation of law, courts of equity would not interfere, or lend their aid to either party, to enforce it. Other questions of minor importance are presented, but we shall examine only that which pertains to the merits of the case as made by the bill.

The 3d section of the charter of the complainants, (Laws 1827, 505,) provides, that they " shall be in law capable of purchasing, holding and conveying estate, real or personal, for the use of the said corporation."

The 9th section provides, " That the lands, tenements and hereditaments, which it shall be lawful for the said corporation to hold, shall be only such as shall be required for its accommodation in relation to the convenient trans-

acting of its business, or such as shall have been *bona fide* mortgaged to it by way of security, or conveyed to it in satisfaction of debts, previously contracted in the course of its dealings, or purchased at sales upon judgments, which shall have been obtained for such debts."

Under these, and the other provisions of the charter, what are the rights and powers of the corporation as to becoming purchasers and vendors of real estate?

A capacity to purchase and alien land, unless specially restrained by its charter or by statute, has been held to be an incident, at common law, to every corporation. This general power it has been found necessary, in England, to restrain by statute; and there their powers in this respect are understood to be general and unlimited, except so far as controlled by such statutes. A large proportion of the corporations there hold their corporate rights by prescription. This supposes the original grant no where to be found in written form. The uncertainty of the limits of the powers granted, and the great extent of powers claimed at an early period, created a necessity of limiting them by act of parliament. The statutes of mortmain have this effect, in reference to purchasing and holding lands.

In this country few instances can be found of the existence of corporations, whose charters did not originate in express legislative enactment, and are not to be found printed in the statute books. In these cases the grant of power is before us. The charter defines the grant, with its restrictions and limitations. Unless some other statute, enacted by the same authority, either general or special, can be found, enlarging or restricting those powers, we look no further for the rights of the body corporate.

A corporation, says Ch. J. *Marshall*, being the mere creature of law, possesses only those properties which the charter of its creation confers upon it, either expressly, or

as incidental to its very existence.    *Trustees of Dartmouth College* v. *Woodward*, 4 Wheat. R. 518.    The same doctrine is asserted by *McLean*, J. in *Beaty* v. *Knowles' lessee*, 4 Pet. R. 152, and is, in effect, contained in all the American cases on the subject.    The act of incorporation, whatever may be its object, usually contains, in this country, a specific grant of a right to take and hold lands, but restricts it to certain defined objects, to a specific amount in value, or to such as are acquired in a particular mode. The better opinion seems to be that here, where charters almost uniformly contain such power and such limitation, corporations cannot take and hold real estate for purposes foreign to their institution.    2 Kent's Com. 283 ; *First Parish in Sutton* v. *Cole*, 3 Pick. R. 223 ; Ang. & Ames on Corp. 80.    In determining on the extent of such power in a particular instance, under a charter, we are to look at the grant and the restriction ; and, unless the power is found in the charter, it cannot be considered as possessed. The very grant of specified powers, under restrictions, is an exclusion of other powers in reference to the same subject matter, not granted by the charter.    *People* v. *Utica Insurance Co.*, 15 John. R. 357.    The lawful right of the Bank of Michigan to become the grantee of lands, must, then, be such, and such only, as is given by the provisions of its charter.    The 9th section clearly forbids the *holding* of any lands not specified by its terms.

It is urged by the counsel for the complainant, that the general power to purchase and convey real estate, given by the third section, is not affected or limited by the provisions of the ninth section.    The latter only uses the word *hold ;* and it is contended that the right of buying and selling lands is not unlawful ;—that the only design of the provision was to prevent real estate from being locked up in mortmain, in the hands of the corporation. But it seems to me that a further object is evident in the

charter.   The general object of the charter is to create a money corporation, to give all the power required for banking operations, and no more.   The corporation is expressly authorized to hold real property requisite for carrying on the banking business, and such as it may be necessary to receive in satisfaction of debts due it.   But it is clear that it never was designed to make this corporation a real estate broker, or to permit it to divert its funds from their legitimate channels, to become a speculator in lands.

This design seems to me to be evident, not only from the tenor of all the provisions of the charter, but also from the limitations before mentioned.   In Aug. & Ames on Corp. 80, the design of this kind of restriction is said to be to prevent monopolies, and to confine these powerful bodies strictly within their proper sphere.   In *Silver Lake Bank* v. *North*, 4 John. Ch. R. 370, the Chancellor speaks of the restraining clause in the charter as " only meant to prohibit the banking company from vesting their capital in real property, and engaging in land speculations."   See also *Trenton Bank* v. *Woodruff*, Green's N. J. R. 117.   It is clearly the intention of the lawmakers thus to limit the operations of the bank; and that construction must be given to the act, unless a different meaning is conveyed by the words of restriction.

To sustain their view of the subject, on the part of the complainants, the case of *Leazure* v. *Hillegas*, 7 Serg. & Rawle, 313, is cited.   This was an action brought by Hillegas to recover possession of certain premises occupied by Leazure.   The title exhibited by the plaintiff showed a conveyance to the Bank of North America, and from the bank to the plaintiff's grantor.   It was claimed that the bank had no power to take and convey the land, and, therefore, that no title could be derived through it by the plaintiff.   The restraining clause in the charter of that

bank provides, that the lands it shall be enabled to "purchase and hold," shall be only such as are therein specified.   The Court held that, under this provision of the statute, it was prohibited only from holding a title—from retaining lands purchased, and not from purchasing.   This decision was made directly with a view to the statute of mortmain, which was in force in Pennsylvania, and with reference to which the words might, perhaps, well have been considered as used by the lawmakers.   The effect of allowing corporations to take lands, under that statute, was, that the state would have the right immediately to take possession of, and to retain them.   They became the property of the state whenever they were claimed by it.

The state, instead of having an object in restraining the banks from receiving conveyances, or dealing in lands, really had an object in permitting and promoting it.   Every purchase was, at the option of the state, for its benefit; and, though the bank could convey it to another, yet the grantee took the property subject to the same right of the state to deprive him of it.   The charter being granted with reference to the general statute of mortmain, then in force, and constantly attaching its consequences to all lands, the title to which passed through the corporation, it was not perhaps unreasonable to construe it, as not intended to prevent the buying of lands, subject to the right of the state, but only to holding or retaining them against the state.   And the Court, in the case last cited, say, that while the purchasing and *holding* might be dangerous, by bringing too much land into mortmain, yet purchasing subject to the statute of mortmain, which authorized the commonwealth to appropriate the land to its own use, could be attended with no danger.   And, indeed, when this statute was in force, it could not be necessary to incorporate a clause in the charter restraining the cor-

poration from buying property, although it might be to put a restriction on the amount they could retain as against the state. Without such restriction, there was no danger of their becoming dealers in land, and diverting their capital to this, instead of the legitimate business of banking. The forfeiture incurred under the statute of mortmain would prevent it, and the defect in a title passing from the corporation. would deter purchasers. In the opinion of the Chief Justice just cited, the right of a corporation to purchase lands, though its charter is silent on the subject, is assumed. See also *Baird* v. *Bank of Washington*, 11 Serg. & Rawle, 411.

The statute of mortmain has never been in force in this or any other state of the Union, except Pennsylvania. We cannot consider the restrictions or powers specified in the charter of the Bank of Michigan, as made in reference to such previous law binding on the acts of the bank. Nor can we say that the mischiefs which it might otherwise be construed to include, are already provided against by another law. On the contrary, it stands alone, and is to receive a construction warranted by its language, and in accordance with the evident intention of the lawmakers, as disclosed by the act.

The disability to *hold* lands seems almost necessarily to imply a disability to become the grantee and vendor of real estate. There can be no grant of land without a grantee capable of taking; and he who takes and conveys to another must necessarily be, for the time intervening, the holder of the estate. If the restriction in the charter takes away the capacity to hold, it must, therefore, take away the power of receiving the estate for the purpose of conveying to another. The corporation cannot deal in real estate, receiving and conveying the title in its corporate capacity, without in every instance *holding* that estate; and a title derived through it, to be good, must ne-

cessarily imply the right of the corporation to take the estate and hold the title until conveyed.

When the statute restricts the corporation in the right of holding lands, it seems to me to intend to make all *holding* of real estate, for purposes not expressly excepted by the charter, unlawful.   And this right is not measured by the length of time which the holding continues.   If it is intended only to make the continued holding unlawful, when does such holding by the bank cease to be lawful? If it is lawful to take a title and hold for an hour, does it become unlawful if a conveyance should not be made for a day or a week?   Does the lawfulness or illegality of the transaction depend on the length of time the title is held?   If so, the tendency of the restriction would be to induce speedy conveyance by the corporation, but not to prevent its entering the field as a land speculator.   It might relinquish its banking business altogether, and, investing all its means in, and directing all its attention to, the buying and selling of real estate, would keep within its charter, so long as titles passed rapidly on the record to and from the corporation.

It is said this provision was intended to have the same effect as the *statute of mortmain, in preventing lands from* accumulating and being bound up in the hands of corporations.   To me it seems no such exclusive design could be had, because little necessity for accomplishing that object existed.   This statute, like many of the ancient statutes of England, had its origin in a state of things which never did and never can exist in this country.   The ecclesiastical corporations of that country, who held their corporate powers under no written grant, with no very well defined limits of power, and without specification of the time when their corporate existence should cease, absorbed in perpetuity many of the best lands in the kingdom, prevented their transmission from man to man, withdrew

them from the feudal services which were ordained for the common defence, and curtailed the lords of the fruits of their seignories, their escheats, wardships, reliefs, and the like. This state of things made it necessary to provide that titles obtained by such corporations should not thus be absorbed forever, and to release the lands from what was quaintly denominated the *death-clutch* of the corporation. Scarcely a single reason exists here for the imposition of similar restrictions on the tenures of corporations. The holding of land by a corporation here deprives no lord of his accustomed services, or his rents, or his escheats, or his reliefs, attached to, or growing out of the land. It withdraws no feudal services from a superior, or from the government. Premises so held are liable to contribution for public expenses, as if held by individuals. They may be sold and conveyed voluntarily by the corporation, or taken by force of law for its debts, and the title of the institution defeated. Besides, we have few charters *in perpetuam*, and none whose powers are not clearly defined. The period of their existence is usually fixed by the very act that gives them life. The charter under which the complainants have existence, limits that existence to a period less than the average length of life of individuals. At the end of that time, unless legislative aid further extend its powers, all the lands held by the corporation cease to be so held. When there is no especial legislative act to the contrary, upon the dissolution of its charter, all the lands held by a corporation revert to the grantor. By the provisions of the present laws of this state, they become liable to be sold for the payment of its debts, and the proceeds to be distributed among the stockholders; and if such sale should fail to be made, they would revert to the grantor.

From this view of the subject, it seems scarcely a reasonable construction of the limitation referred to, in the

charter of the bank, to suppose that it was intended only to restrain the continued holding of lands for an indefinite period in the hands of the bank.   Both the phraseology, and the evident intent of the restriction, appear to me to apply to that holding of land which is necessary in all cases of a conveyance to and from the bank.   It is intended to restrain the corporation from entering into speculations and purchases of real estate, which are clearly foreign to the objects of its creation.   The immunities incident to a corporation are thrown around its capital, its profits, and its business; but they are not intended to be extended to it as a buyer and seller of lands. Those which it may hold are specified,—the necessary building for banking purposes, and such lands as it may be found necessary to receive for debts due to it.   All others are without the scope of its legitimate powers and business.

It is not pretended that the lands mentioned in the complainants' bill are within this exception.   The bill shows that the complainants were to purchase them of a third person, and to sell them to the defendant.   It contemplated not even a payment in full by the bank, but, on the contrary, contains a contract that the complainants shall, within five years, clear the premises from any mortgage or incumbrance they may create upon it for the purchase money.   It is difficult, from the facts set out in the bill, to look upon the transaction contemplated by the contract to be other than a speculation in lands, entirely foreign to the objects, and beyond the legal powers of the corporation. If such a transaction be construed as within the scope of its chartered rights, it is certain there can be no limit fixed to the business of a bank.

While I cannot doubt that the transaction contemplated by the contract was an unlawful one on the part of the bank, I do not deem it necessary to determine what would

have been the effect on the title to the property, if such a conveyance had been made to the bank, and by it to another person. Many charters apply the restriction to the property which the bank shall be *enabled* to hold;—this speaks of that which it shall be *lawful* for it to hold. Even under the former words, it seems to have been considered, in Pennsylvania and Virginia, that the title would not be defeated. A violation, and consequent forfeiture of its charter, would be a certain consequence of such unlawful act. But our inquiry here is not what would be the consequences of the act, but whether the act was lawful; and I am satisfied that the contract could never have been carried into effect by the bank, without holding real estate not allowed by its charter, and in violation of its provisions.

This leads to the second inquiry in the case,—can this suit be maintained?

It was one of the earliest principles established, that courts of justice will not lend their aid in enforcing contracts which are contrary to law. If, in transactions of this character, either party has obtained the advantage of the other, however great may be the hardship of the case, courts will not aid one violator of law against the other, but will leave them as they are found. *Melior est conditio possidentis* is the maxim in such case, both in law and equity.

The rule applies as well when the subject matter of the contract is *malum prohibitum*, as when it is *malum in se*. In *Aubert* v. *Maze*, 2 Bos. & Pull. 371, the doctrine which applies in cases of *malum in se*, was applied to a transaction prohibited by statute. In *Watts* v. *Brooks*, 3 Ves. Jr. 612, the same doctrine was applied in equity. In *Ribbans* v. *Crickett*, 1 Bos. & Pull. 264, under the statute prohibiting the furnishing of provisions to voters, the court refused to enforce a contract by the defendant to pay for such provisions, upon the ground that it was a contract to disobey

the law.   The same  principle runs  through all the Eng-
lish cases.

The courts of this country have uniformly adopted the
same *principle*, and refused to assist either party in the
enforcement of a contract to violate the law.   *Mitchell* v.
*Smith*, 1 Binn. R. 110; S. C. 3 Dall. R. 269; *Maybin* v.
*Coulon*, 4 Id. 298; *Duncanson* v. *McClure*, Id. 308; *Nichols*
v. *Ruggles*, 3 Day's R. 145; *Pratt* v. *Adams*, 7 Paige's R.
615; *Armstrong* v. *Toler*, 11 Wheat. R. 258; *Hannay* v.
*Eve*, 3 Cranch R. 242; *Patton* v. *Nicholson*, 3 Wheat. R.
204; *Ex'rs of Cambioso* v. *Assignees of Maffett*, 2 Wash. C.
C. R. 98; *Bartle* v. *Coleman*, 4 Pet. R. 184; *Craig* v. *State
of Missouri*, 4 Pet. R. 410.

In *Hunt* v. *Knickerbacker*, 5 John. R. 327, the rule is laid
down correctly, to be, that all contracts, which have for
their object any thing which is repugnant to the general
policy of the common law, or contrary to the provisions of
any statute, are void, and not to be enforced.   This was a
contract to sell lottery tickets without authority from the
legislature of New York, which was rendered illegal by a
law of that state; and the court refused to enforce the
contract.   "No case, I believe, can be found," says
*Thompson*, J. " where an action has been sustained, which
goes in affirmance of an illegal contract."   *Burt* v. *Place*,
6 Cow. R. 431.   The inquiry as to the character of the
act to be done, is, whether it is rendered illegal.   It is, I
apprehend, of no importance to determine what is the
consequence of the violation of the law to the parties,—
whether it is visited with punishment as a criminal act, or
is attended with civil consequences affecting the pecuniary.
interests of the parties, or whether they are left to the
mercy of each other.   When once it is determined that
the act contracted to be done is prohibited by law, the
court will afford no aid.

There may be a difficulty in cases where contracts are

made in reference to matters but remotely tainted with immorality or illegality, and not the immediate subject of the undertaking of parties, to determine in what instances the principle should be applied; but when the very act contracted to be done is itself illegal, there can be no doubt of the application of the principle.

The Bank of Michigan contracted to obtain and convey a title to real estate, under circumstances which made it a transaction prohibited by the spirit and terms of its charter. The defendant, with knowledge of the unlawfulness of the transaction, (for the charter is declared to be a public act,) entered into the contract. Each party to the contract put himself in the power of the other; and, as a court of equity would not interfere to compel the bank to perform its agreement, by buying and selling lands in violation of the law, so aid cannot be afforded to the bank to compel the defendant to perform on his part. The decree of the Chancellor sustaining the demurrer, must be affirmed.

*Decree affirmed.*