# J. Edgar Thompson v. Ira Waters.

*Railroad company: Foreign corporation: Capacity to take and hold lands.* The question whether a railroad company, organized under the laws of the state of Indiana, is competent to take the title to lands in the state of Michigan, is one which depends, first, upon the laws of Indiana, and second, upon the laws of Michigan, and the public policy indicated by its legislation.

*Powers and capacities of foreign corporation.* Such corporation has no powers or capacities which were not, expressly or by implication, given by the laws of Indiana; and none which would not be recognized and sustained by the courts of that state, had the same question of capacity to take these lands come before them for adjudication.

*Statutes and decisions of Indiana: Capacity of Indiana corporation to hold lands in another state.* The statutes of Indiana and the decisions of the courts of Indiana considered, and the conclusion reached that, so far as the question depends upon the laws of Indiana, such corporation is competent to take lands in this state, in payment of, or security for, debts due to it here.

*Limit of powers of corporation: Power to purchase and sell property in another state: Such right not strictly a franchise: State comity.* The strictly legal existence, by force of obligatory law, of a corporation, is confined to the state which created it and endowed it with its powers, capacities and rights; and it can only exercise those powers, capacities, and rights in another state by the permission, express or implied, of the legislative power thereof; but the mere right of such corporation to purchase and sell property, not being in its nature strictly a franchise, will be recognized and protected in another state, subject only to the qualification that the enjoyment and exercise of such right shall not be contrary to the laws or settled policy of the latter state, or prejudicial to its interests or those of its citizens.

THOMPSON v. WATERS.

*State comity: Legislative policy.* The power of determining whether, and how far, or with what modification, or upon what conditions, the laws of one state or any rights dependent upon them shall be recognized in another, is a legislative one; the comity involved is the comity of the states and not of the courts; and the judiciary must be guided in deciding the question by the principle and policy adopted by the legislature.

*Legislative policy: Comity: Inference.* In ascertaining what this legislative policy is, the courts are to be guided, not only by the express provisions made by the Legislature and the natural implication from them, but also by their silence; for, if they have made no provision at all upon the particular subject, or branch of the subject, or question involved, it may reasonably be inferred that they intended to adopt the generally received principles of comity, and to that extent to recognize the rights dependent upon the foreign laws.

*Power of corporation to hold lands in another state: An affirmative enabling act not necessary.* Where a corporation is created in one state with powers, so far as that state can give them, of taking, holding, and conveying lands in another state where the legislature have not expressly or by implication forbidden it, an affirmative enabling act is not necessary to give them the capacity to take, hold, and convey, lands in the latter state; this capacity rests upon the same principles of comity as their capacity to make or enforce contracts, or to acquire, hold, and convey, personal property.

*Presumptions favor legality.* In a case involving the validity of a deed of lands in one state to a corporation created by the laws of another state, in the absence of any showing what the consideration for the deed was, if any species of consideration will support the deed, it will be presumed that it was made for that consideration; courts will not presume illegality.

*The right of a corporation to receive conveyance of lands in payment of debts.* The courts of any state are bound, unless the constitution or the legislature have, either expressly or by clear implication, declared a contrary rule, to recognize the right of corporations of another state to realize and collect the debts due to them by receiving a conveyance of lands in the former state.

*State policy: Comity: Cestui que trust: Legal title.* So far as any question of state policy, or of danger to be apprehended, or of comity, is concerned, there is no distinction to be made between recognizing the equitable right of a foreign corporation as *cestui que trust* where the legal title is vested in a trustee, and its right to hold the legal estate.

*Railroad corporations not to be distinguished from others.* And, so far as any such question is concerned, there is nothing peculiar about railroad corporations upon which to base a distinction between their rights in that regard and those of banking, or insurance, or any other, corporations.

*Legislative policy of this state: Comity.* The legislature of this state have, in no respect material to the question under consideration, adopted any policy or enacted any statute modifying the generally received doctrine of comity.

*Acts of incorporation.* The several separate acts of incorporation of our state are too various and dissimilar in this regard to throw any light upon the question of the state or legislative policy.

*Statutes construed. Comp. L., 1857,* § 4834, applies only to acts forbidden to be done by *any* corporation, etc.; and puts foreign corporations upon the same footing as domestic corporations are placed by those state laws, and those only, which apply generally to all the corporations in the state.

*Rev. Stat. 1846, Ch. 55,* § 7 *(Comp. L. 1857,* § 2149), neither gives nor takes away any power whatever, but merely confirms such powers as any such corporation then had or might thereafter have "by law;" it is to be treated as a

declaratory statute merely; and the term "authorized by law" includes those incidental powers or rights to hold lands which result, as common-law incidents from the creation of a corporation, without being expressed, so far as such incidents are not restrained by the legislature.

*Heard April 6 and 14, 1871. Re-argued April 24 and 25, 1872. Decided July 10.*

·Error to St. Joseph Circuit.

. In view of the importance of the question involved, the court of its own motion ordered a re-argument of this cause.

*H. H. Riley* and *R. Brackenridge,* for plaintiff in error.

*Shipman & Loveridge,* for defendant in error.

CHRISTIANCY, CH. J.

This was an action of ejectment brought by the plaintiff in error against the defendant in error in the circuit court for the county of St. Joseph, to recover the north half of the south half of section 24, township 7 south, of range 11 west, situated in said county of St. Joseph.

Both parties claimed title through J. Eastman Johnson, who owned the land previous to the deeds stated below.

The plaintiff's claim of title was this: On the 20th of July, 1853, Johnson, by warranty deed, conveyed the land to the Fort Wayne & Chicago Railroad company, a company incorporated under the laws of Indiana. By several acts passed by the legislatures of the states of Pennsylvania, Ohio, Indiana, and Illinois, authorizing the consolidation of railroad companies, and by the articles of consolidation of the 6th May, 1856, consolidating the Ohio & Penn. R. R. company, the Ohio & Indiana railroad company, and this Fort Wayne & Chicago railroad company, under the name of "The Pittsburgh, Fort Wayne & Chicago Rail-

road Company," all the powers, rights, and franchises of said several companies so consolidated, passed to, and became vested in, the said Pittsburgh, Fort Wayne & Chicago railroad company. This consolidated company, on the first day of December, 1856, executed to Hugh McCullough, as trustee, a mortgage upon this and other lands and property. And the said Pittsburgh, Fort Wayne & Chicago railroad company, and McCullough, the mortgagee, by their several deeds, dated respectively October 17th, and October 24, 1860, conveyed the land in question to the plaintiff. All the foregoing were duly recorded in the office of the register of deeds for St. Joseph county, prior to the execution of the deed from Johnson to Merrick, mentioned below.

The defendant claimed title under the following conveyances:

1st. A quit claim deed from J. Eastman Johnson to Benajah G. Merrick, dated November 29, 1860; and

2d. A quit claim deed from Merrick to defendant, dated November 30, 1866; both of which deeds are duly recorded. The lands lie at least fifty miles from any part of the railroad in question.

The court charged the jury at the request of the defendant, " that the Fort Wayne & Chicago railroad company, at the time of the execution of the conveyance from Johnson to it, had no power to purchase and hold the lands in question in this state," and, " that the jury will find for the defendant."

This raises the only question in the case which needs to be noticed. Was the Fort Wayne & Chicago railroad company, being a corporation created by, and existing under, the laws of the state of Indiana, competent to take the title to this land in this state, under the deed executed to it by Johnson?

This question depends, first, upon the laws of Indiana;

25 MICH.—28.

and, second, upon the laws of this state, and the public policy indicated by its legislation.

1st. As it was an artificial being, created only by the laws of Indiana, and by them alone endowed with whatever powers and capacities it possesses, it could have no capacities nor exercise any powers anywhere, which were not, expressly or by implication, given by those laws; or, in other words, no powers or capacities which would not be recognized and sustained by the courts of that state, had the same question of capacity to take these lands come before them for adjudication.

The Fort Wayne & Chicago railroad company, to whom this land was conveyed, was organized under the general railroad law of that state, entitled, "An act to provide for the incorporation of railroad companies," approved May 11, 1852. Most of the provisions of this act, in reference to the powers of companies to take lands, confine the power to such as the necessities of the company require, in exercising its franchises of building and maintaining the road.

The second subdivision, however, of the thirteenth section, gives power to " receive, hold, and take such voluntary grants and donations of real estate and personal property as shall be made to it, *to aid in the construction, maintenance, and accommodation of such railroad;* but the real estate thus received, by voluntary grants, shall be held and used for the purpose of such grants only. It might admit of a question whether, under this provision, there was not power to acquire lands to be converted into money for the use of the company; but the question is quite immaterial, since the act of the legislature of the state of Indiana, of January 20th, 1852,—which, if it did not take effect at an earlier date, took effect at least with the Revised Statutes of that state, of which it is a part

(*Chap. 184*), on the 6th of May, 1853 (*Jones v. Cavins, 4 Ind., 305; Ledley v. The State, id., 580; State v. Kiger, id., 621*),—gives power (§ 2) to any railroad company which, then or thereafter, might be incorporated, by the consent of the directors of the same, "to receive the subscription for the capital stock of said companies, under such regulations and restrictions as their boards of directors may prescribe, any lands, town lots, real estate, or other description of property, as may be offered for that purpose: *Provided however*, That the same shall be sold, except so much as may be necessary for the use of said road, or for the purposes aforesaid" [referring to certain provisions in the first section, in reference to lands taken on subscription of stock, or purchase for depots, turnouts, workshops, warehouses, etc.], "within a reasonable time, and the proceeds applied for the construction of said roads, or their appurtenances." That under this act the courts of Indiana would hold that these lands, though out of the state, might have been received for stock of the company, is sufficiently apparent from the decision in *Cincinnati, Union & Fort Wayne R. R. Co. v. Pearce, 28 Ind., 502*, in which it was held that lands situated in the state of Ohio, conveyed to an Indiana corporation, under authority of this act, constituted a valid consideration for a contract on the part of the company to issue stock for the amount.

And I see no reason to doubt that the courts of that state would recognize the right of the company to take lands in another state, in payment of a debt due the company, accruing in the legitimate prosecution of its business, and which would, therefore, be represented by the stock of the company. Indeed, independent of this act of January 20th, 1852, I see no reason why the courts of that state should not recognize the right of the company to take such lands in payment of a debt so accruing, though they might not allow them to take the funds of the company to invest

in another state. The main objection to allowing corporations, in the state of their creation, to hold lands not occupied and used in, or necessary to, the exercise of their franchises, is based upon the idea that it might be prejudicial to the public interest of that state, to allow corporations to become speculators in lands, or to hold them in large amounts, keeping them out of market for an unreasonable time, and preventing improvement, etc.; but this objection could not well be urged in the state of their creation, against their holding lands in *other* states, taken in payments of debts justly due them, accruing in the course of their legitimate business. The state in which the land lies might, if it chose, object; but the state of their creation could not be interested in raising such objection; but so far as it was interested at all, it would seem to be in favor of sustaining the right; for, unless the creation and prosperous continuance of such corporations were supposed to be objects of public interest, which deserved to be fostered, it is not likely the state would have authorized their creation. The courts and public authorities of such state may, therefore, be presumed to look with favor upon such facilities afforded to their corporations for collecting the debts due them in other states. And if the case were reversed, and one of our corporations should take lands in the state of Indiana, in payment of a debt due them there, we should, without hesitation, say, "If Indiana makes no objection to this, we do not see how any public interest of Michigan, or its people, can be promoted by our refusing to allow the corporation to avail itself of the facility thus afforded for the collection of its debts."

We may, therefore, safely assume that the courts of Indiana would not refuse to recognize the right of this company to take lands in this state, in payment or security for debts due to it here.

But these considerations only *go* to show that the laws

of Indiana present no obstacle to the taking or holding of these lands by the company; in other words, they show that, by the laws of Indiana, so far as the question depends upon them, this company was competent to take this land in this state.

But the laws of Indiana have no force or operation (as *laws*, giving powers, or creating or enforcing obligation) with-in the state of Michigan.  No state has the power to create corporations, or to regulate their powers, or to authorize the exercise of corporate franchises, in other states.   It may confer powers, in the nature of a commission, to be exer-cised anywhere, upon condition, that their exercise be assented to by the state or sovereignty where their exercise is sought; but without this assent, express or implied, such powers would be nugatory outside of the state granting them.    Each state, by its own legislature, must determine for itself all such questions of public policy arising within its limits.

But, upon the principle of comity, which is a part of the voluntary law of nations, recognized, to a greater or less extent, by all civilized governments, effect is frequently given in one state or country to the laws of another, in a great variety of ways, especially upon questions of contract rights to property, and rights of action connected with, or depend-ing upon, such foreign laws, without which commercial and business intercourse between the people of different states and countries could scarcely exist.

And, among the states composing the federal union,—whose relations and intercourse are much more intimate than those of foreign states (properly so called), and the interests of whose citizens are so intermingled that, in commercial and business enterprises, state lines are scarcely more regarded by the people than county and township lines,—it is the common interest of all to encourage the-

recognition of those principles of state comity which tend to make us, in feeling and in interest, one homogeneous people, without limiting the independence of any states, and reserving to the people of each the sole right of regulating their own internal affairs, and of determining, at any time, through their legislation, what limits to the recognition of the laws of other states, public policy or the welfare of the people may require to be imposed. Such has been the general course and tendency of the judicial decisions in the several states.

Upon scarcely any subject has this comity been more generally admitted and administered than in reference to corporate rights and interests.

The rights which they have generally been allowed to enjoy, and the powers they have been allowed to exercise, in states other than that of their creation or domicil, have varied considerably, according to the nature and objects of the different corporations, and the corresponding differences in the mode of doing their corporate business. An insurance company in doing its business in another state, owing to the nature of the business itself (making contracts of insurance), would seem to be exercising through agents, its corporate franchises, in the same way as in the state of its creation, with the exception of corporation meetings and the strictly official action of its officers; and for this, as well as the prudential reason of protecting their citizens from imposition, and, perhaps, encouraging home companies, other states have quite generally required their compliance with certain rules and regulations fixed by the legislature, as conditions, upon which alone, they are allowed to do their business within such state. Such has been the case in reference to insurance companies in our own state; and somewhat similar regulations have sometimes been adopted in some states, with reference to a few other

corporations. But there are many other corporations whose business is, in its nature, more of a local character, confined mainly within the state of its creation, and only incidentally making contracts or acquiring property in other states, in the course of carrying on their home business, and in such cases the legislatures of the latter have seldom interfered, or placed them under any restriction. And the rule seems to be generally and well settled that the corporate existence, rights of making and enforcing contracts, of acquiring property and transacting business (not requiring the exercise of official corporate action or franchises within the state), of a corporation created by the laws of one state, will be recognized and protected in another; subject only to the qualification, that the enjoyment and exercise of such rights shall not be contrary to the laws or settled policy of the state in which they are sought to be enjoyed or exercised, or prejudicial to the interests of such state or its citizens. With these limitations the rights above mentioned, of a corporation created in one state, are as clearly recognized and as generally enforced in another, as the individual rights of an inhabitant of one state are recognized and enforced in another, of which he is a non-resident; though such corporations cannot, of course, claim in another state, such recognition of corporate existence or rights, as a *citizen* of the state of its domicil, under the clause of the constitution which secures to the citizens of each state "all the privileges and immunities of citizens in the several states," as this would impair the independence of the several states, by depriving them of the right to regulate their own internal affairs, according to their own interests, and ideas of state policy.

A corporation, however, in any aspect in which it is here *essential to consider it*, is but an artificial person, whose strictly legal existence, by force of obligatory law,

is confined to the state which has created it and endowed
it with its powers, capacities, and rights; and it can only
exercise those powers, capacities, and rights, in another
state, by the permission, express or implied, of the sover-
eign or legislative power of the latter, which must be its
own judge how far, and upon what conditions, it is con-
sistent with its own domestic policy, and the interests of
its citizens, to accord such recognition. The mere right of
a corporation to purchase and sell property, not being in
its nature strictly a franchise, but a right existing equally
in individuals without special grant, is very generally recog-
nized in states other than those of its creation.

And, as well observed by Judge Story, in reference to
questions of this kind (*Conflict of Laws*, §§ *35 and 37*),
fully approved by the supreme court of the United States,
in *Bank of Augusta v. Earle, 13, Pet., 589:* "In the silence
of any positive rule, affirming, or denying, or restraining
the operation of foreign laws, courts of justice presume the
tacit adoption of them by their own government, unless
they are repugnant to its policy or prejudicial to its interests.
It is not the comity of the courts, but the comity of the
nation" [or state] "which is administered, and ascertained in
the same way, and guided by the same reasoning by which
all other principles of municipal law are ascertained and
guided." See also *Runyan v. Coster's lessee, 14 Pet., 122;
Bard v. Poole, 12 N. Y., 495,* and *Merrick v. Van Sant-
voord, 34 N. Y., 208.*

As it is not, then, the comity of the courts, but that of
the state, and the question is upon the adoption or quali-
fied adoption in this state, of the laws, or rather certain
incidents growing out of the laws, of Indiana, it follows
that the power of determining the question whether, and
how far, or with what modification, or upon what condi-
tions, the laws of that state, or any rights dependent upon

them, shall be recognized here, belongs to the legislative or law making power of this state, and that the judiciary, whose province is only to declare, and not to make, the law, must be guided in their decision by the principle and policy adopted by the legislature of this state in reference to this question. And in ascertaining what this legislative policy is, we are to be guided not only by such express provisions as they have chosen to make, and the natural implication from them, but also by their silence, which may furnish as clear an indication of what that policy was intended to be, as can be drawn from what they *have expressed;* since, if they have made no provision at all upon the particular subject, or branch of the subject, or question involved, it may reasonably be inferred that they intended to adopt, and left to the courts to apply, the generally received principles of comity, and, to that extent, to adopt the foreign law, or rather to recognize the rights dependent upon such laws; and if they have chosen to leave the matter without any legislative provision, the case must be a very clear one indeed, which would authorize the courts to refuse such recognition, on the ground that it would be prejudicial to the interests of the state; since the legislature are the proper representatives of the public interest, and, having the exclusive power to determine what shall be the public policy of the state, if they have chosen to make no enactment upon the subject, it is natural to infer they omitted to do so because they thought it unnecessary, and that the generally recognized principles would be sufficient for such cases. None of the foregoing principles have been seriously questioned in this case, so far as they relate to the power and capacity of corporations, created in one state, to make and enforce contracts, and to acquire *personal* property in another.

But it is insisted that the question of the power or

capacity to take the title to real estate, to hold and dispose of it, stands upon a different ground from that of acquiring personal property. There are undoubtedly some differences between personal and real property, in respect to the laws by which they are to be governed; but whether they affect the present case, remains to be seen. Thus, personal property generally follows the person of the owner, or, in other words, the right to, and the mode of acquiring and disposing of, personal property, are generally to be governed by the law of the domicil of the owner, while real estate, in every thing which pertains to the mode and validity of conveyance and transfer, depends upon the law of the place in which it is situated. But it would be entirely competent for each distinct sovereignty to adopt, in this respect, the same rule as to both kinds of property within its limits, if it thought fit to do so; and it is by comity only, that personal property, in one state or country, is allowed to be governed by the laws of another. As to the mode of acquiring, and transferring, and transmitting, real estate, that comity has not been carried so far as to allow the foreign law to govern the mode or form of conveyance. And in most countries formerly, and in many even now, it has been the custom to establish their own peculiar. rules governing the capacity of parties to take, or the parties capable of taking and transferring, real . estate, while this has not been usual with reference to the capacity to take, hold, or transmit personal property. Thus, in England, and formerly in many of the United States, though aliens might take, they could not hold, land, if claimed by the king or the state, and could not transmit or convey it. But it is quite competent for any sovereignty or state to abolish this distinction, and to make the capacity the same in both cases, without any restriction upon either. This is precisely what has been done in this

state, and in most of the other states of the Union. Our statute (*Rev. Stat. of 1846, ch. 66, § 35*) places aliens, whether residents of the state or not, upon the same footing in all respects, as native citizens of the state, or of the United States, in reference to the right to acquire, hold, convey and transmit lands. And the constitution prohibits the legislature from establishing any less liberal rule, as to such aliens as are or may be residents of the state.—*Art. XVIII., § 13.* All persons alike, therefore, without reference to nationality, race, color, sex or age, who in this state are competent to take, hold, convey, or transmit personal property, can do the same with real estate. The rule is general as to both, and legislative action would be required to create an exception as to either. In fact, lands, in all the western states at least, have become about as much articles of trade and commerce, as goods or other personal property, and it has been the policy of most of them to encourage this traffic, and to facilitate the acquisition and transfer of real estate.

Among the powers or capacities incident to a corporation at common law, without any special mention in their charter, was that of taking, holding and conveying lands ; and these incidents still remain even in this country, where charters are granted only by the legislature; subject only to such restrictions as the legislature has seen fit to impose, by express provision or tacit implication. The act of incorporation, in effect, gives to the corporation substantially the powers and faculties of a natural person, except as they are in some way restrained by the act of incorporation, or some other law of the state creating it.

When, therefore, a corporation is created in the state of Indiana, with powers, so far as that state can give them, of taking, holding and conveying lands in this state, I do not see upon what principle it can be held that an affirm-

ative enabling act in this state is necessary to give them the capacity to take, hold and convey such lands here, unless our legislature have, expressly or by implication, forbidden it.    The question of capacity seems to me to rest upon the principles of comity, as much as their capacity to make or enforce contracts, or to acquire, hold or convey personal property.    I say the question seems to me to rest upon the same principles, but by this I do not mean that there may not be stronger reasons against recognizing that capacity as to land, than as to personal property; but these are all reasons of public policy which bear upon the question of comity, and, therefore, more appropriate for the legislature than the courts.    Thus the main, if not the only, evils to be apprehended from allowing corporations, domestic or foreign, to take, hold or convey lands are: 1st,—The danger of their becoming speculators in lands to large amounts, keeping them unimproved and thereby retarding the progress of settlement and improvement, or, if improved, preventing settlers from obtaining clear or independent titles, and introducing a system of tenancies in which the tenants would be, in a great measure, dependent upon such corporations; 2d,—The holding of such lands for a long period of time, as they pass by perpetual succession without any change or break by death, as in the case of natural persons; and 3d,—The influence which wealthy corporations, holding large bodies of land in the state, might exercise upon the legislature.    These considerations apply with no peculiar force to railroad corporations as such, but equally to banking, manufacturing, insurance or other corporations; and they are all very proper considerations for a constitutional convention, in framing the fundamental law, and for the people in adopting it, as well as for the legislature, who, in all matters not fixed by the constitution, are properly vested with the

power of determining the public policy. And in a case where it should very clearly appear to the court from the amount of the lands purchased, or the purpose for which they were purchased, or other circumstances, that the dangers I have mentioned were seriously to be apprehended, it may be (though the present case does not call for an opinion upon this point), that the court would be authorized, without any legislative prohibition to that end, to refuse to recognize the law of the state creating the corporation, or so much of it as had undertaken to confer the right of holding such lands; and, consequently, to treat the conveyance as void for want of such capacity. But when, from the nature of the case, no such danger can be reasonably apprehended, I see no very intelligible ground upon which the court could thus treat the conveyance as void, unless the legislative department, in some way, have clearly indicated a policy which requires it.

In accordance with the principles already explained, it was held in *State v. Boston, Concord & Montreal R. R. Co., 25 Vt., 433* (Judge Redfield giving the opinion), that a railroad company, chartered in the state of New Hampshire, had the right and the capacity to purchase lands in the state of Vermont, without any act of the latter state affirmatively authorizing it; though the land was not taken in payment of, or security for, a debt due the company, but for the purpose of being used in connection with their road, if it should ever be connected with a road authorized in the latter state. And it may, or may not, also legitimately result from the principles I have already expressed, that in the case now before us, the Fort Wayne & Chicago railroad company had the capacity to take this land by the conveyance from Johnson, and to hold and convey the same, though the conveyance were shown to have been made to the company in consideration and in payment of Johnson's

subscription to the stock of the company; inasmuch as the statute of Indiana, which gave the authority to receive the land for stock, also required the lands thus received to be sold within a reasonable time, and the proceeds applied for the · construction of their road and its appurtenances; and it must naturally be supposed to have been for the interest of the. company to make· an early sale, without which the stock subscribed and for which the land was received, could not be rendered available; and the courts of Indiana have by judicial decision fixed the "reasonable time" within which a sale of such lands should be made, at ten years (*15 Ind., 459*), in exact accordance with the provision of our constitution (which took effect Jan. 1, 1851), which provides that, " No corporation shall hold any real·· estate hereafter acquired, for a longer period than ten years, except such real estate as shall be actually occupied by such corporation in the exercise of its franchises,"—a provision which goes upon the assumption or admission that real estate, though not actually occupied by a corporation in the exercise of its franchises, *may hereafter be acquired*, and applies to no other.

But I express no opinion in this case, upon the question, what would be the effect of the conveyance by Johnson to the company, if made in consideration of, or in payment for, stock. This question is not involved in the case. The record does not show that such was the consideration of that conveyance, nor, in fact, what the consideration was, except that the deed expresses upon its face the consideration of sixteen hundred dollars. But this is equally consistent with the fact, that the conveyance was made in payment of a debt, due from Johnson to the company, as that it was paid in any other way. Now, as it does not appear from the record that the conveyance was made in payment for stock, nor what was the actual con-·

sideration for, or purpose of, the conveyance, and we are not allowed to presume illegality,. but must presume the transaction to have been legal till the contrary is shown; if the deed would have been void for want of capacity to take, if given for one species of consideration, or for one purpose, but the company had capacity to take, and the deed would be valid, if made for any other consideration or purpose, we are bound to presume that it was made for the consideration and for the purpose, for which the company had the right and capacity to take it; and consequently the conveyance must be held valid, if it was legally possible for the company to take the title, for *any purpose* or upon any consideration *whatever.—Regents of the University v. Detroit Young Men's Society, 12 Mich., 138.*

If, therefore, this company had the power or capacity to take this land, in satisfaction of a debt due it from Johnson, accruing in the legitimate prosecution of its business, the conveyance must be held valid, and the company must be held to have had the capacity to take the title and the power to convey it.

Now, whatever danger might be apprehended from allowing corporations of other states to take lands for stock, or for purposes of speculation, I cannot conceive that the privilege of taking lands, in good faith, in payment of debts, and which must, therefore, be merely occasional, and with the intention and for the purpose of converting them into money for the realization of the proceeds, can be so dangerous to the public interest of this state or its citizens, as to authorize the courts to declare such conveyance void, on that ground; especially as the property could only be held for ten years, under the constitutional provision already cited.   And I think it may be laid down as a safe and sound principle that, unless the constitution of the state, or its legislature, have, either expressly

or by clear implication, declared a contrary rule, the courts of any state are bound to recognize this right of the corporations of other states, thus to realize and collect the debts due to them; and such seems to have been the course of decisions in the several states where this question has arisen.   See *Silver Lake Bank v. North, 4 John. Ch., 370; Lumbard v. Aldrich, 8 N. H., 31; New York Dry Dock v. Hicks, 5 McLean, 111; Lathrop v. Commercial Bank of Scioto, 8 Dana, 114.*   Though in the first and the last of the cases above cited, the question arose upon a mortgage to such corporation, yet, in Kentucky certainly, a mortgage conveys the legal title; and, therefore, the question is the same as here; and I think the same may be said of the law of New York, when the mortgage was executed, which came in question in the case first above cited.   In the other cases the question arises directly upon the power to take the title.

Most of these decisions expressly, and the others tacitly, go upon the ground that, inasmuch as corporations have the right to make contracts in states other than that of their creation, and to enforce them in the courts of such states (a right not disputed in the present case), in the same manner as an individual of another state is allowed to contract and to sue, they must, in the absence of any legislation to the contrary, be allowed to enforce their judgments in the same way, and have the right to avail themselves of all the same means and facilities for that purpose; and, consequently, that where the individual has the right to obtain the title to lands under execution, the same right must be accorded to such corporations; and that, having the right thus to acquire the title by the compulsory means of an execution, the debtor may, by voluntary agreement, do what, without his consent, the law would compel; and that he may, therefore, convey, by his

own deed, the title which, if he had not thus conveyed, the law would, by its process, have conveyed in spite of him. It is true, as to the case cited from New Hampshire (*Lumbard v. Aldrich, ubi supra*), the law of that state did not (at that time, at least) permit a *sale* of land, upon execution to the highest bidder, but the proceeding was by appraisal, and setting off to the creditor,—in other words, by extent,—by which none but the creditor could take the title (See *Morse v. Child, et al., 7 N. H., 583, etc.*); and in this case the reasoning above adverted to, was, therefore, absolutely conclusive, if the right to sue in the courts of New Hampshire, were admitted or shown. But in the other cases cited, the land might be sold on execution or decree, to the highest bidder, as in this state; and yet the same course of reasoning was held to apply; and I think properly so held; for, though the law in this state, for instance, requires a sale of land upon execution, at which any person, as well as the creditor, can bid; yet, in a question of the kind now before us, we ought to take a practical, rather than a mere theoretical, view of the question; and we know, as matter of fact, that, while the law requires a sale to the highest bidder, there is not one case in fifty, of a sale upon execution, subject as it is to redemption, in which a sale can be made for any reasonable price, if at all, except to the creditor; and, consequently, the creditor is almost always compelled to bid off the land, or lose his debt, or most of it; and it is, or should be, the policy of the law to have the property sell for its real value, or as near it as may be, which can seldom happen, except when sold to the creditor himself.

This power of foreign corporations to take lands in payment of debts, has not, so far as I have been able to find, been anywhere treated as one which is in any way dangerous to the citizens, or inconsistent with the public

25 MICH.—30.

policy of any state; and I have been unable to find a single decided case, in which the question was directly involved, where the power has been denied; and I am not willing to take the lead in establishing a contrary doctrine—a doctrine which, in its injustice, narrowness and illiberality, if not inhospitality, may have much to commend it to Chinese exclusiveness, but nothing in harmony with the liberal spirit of American commercial intercourse.

But we have ourselves, in this court, already held that a foreign banking corporation may take the title to lands in this state, in payment of debts, and impliedly that such corporation may sell such land.—See *Ives v. Bank of Lansingburgh, 12 Mich., 361*, a case which arose since our present constitution. And we have in several instances recognized the right of such foreign corporations, as *cestui que trusts*, when the legal title was vested in a trustee.— See *Trask v. Green, 9 Mich., 358; Taylor v. Boardman, 24 Mich., 287;* and, so far as affects any question of state policy, or danger to be apprehended from foreign corporations owning lands in this state, or any question of comity, I can see no difference between the recognition of such equitable interest, and the legal estate; since the corporation would ordinarily, in both cases alike, control the land. And, in every case of a naked trust, the statute itself executes the trust and places the legal estate in the *cestui que trust.—Rev. Stat. 1846, ch. 63, § 3.*

Now, as already remarked, there is nothing peculiar to railroad corporations, so far as any question of comity, or danger, or prejudice to the interests of the people or the public interests, is involved. But all the same objections of this nature would apply as well and as strongly in the case of a foreign banking, as a foreign railroad, corporation; so that I think the question in the present case may be looked upon as decided in favor of the right of this com-

pany to take this land in payment of a debt, unless we shall find some legislative prohibition.

It remains, therefore, only to see whether such prohibition is to be found in our statutes. The only provisions to be found in our statutes expressly in reference to foreign corporations, which can be claimed to have any bearing upon the question, are the following, which I think do not tend to negative the rule which I have endeavored to show is the rule of comity: *Section 1 of chapter 116 of the Rev. Statutes of 1846 (Comp. L. 1857, § 4833)* provides: "A foreign corporation, created by the laws of any other state or country, may prosecute in the courts of this state, in the same manner as corporations created under the laws of this state, upon giving security for the payment of the costs of suit, in the same manner that non-residents are required by law to do."

This section, instead of rejecting or modifying the rule of comity, expressly adopts the substance of that rule, so far as the enactment extends, and goes only to confirm the conclusions at which I have arrived.

The next section provides: "But when, by the laws of this state, any act is forbidden to be done by any corporation, or by any association of individuals, without express authority by law, and such act shall have been done by a foreign corporation, it shall not be authorized to maintain any action founded upon such act, or upon any liability or obligation, express or implied, arising out of, or made or entered into in consideration of, such act."

This section applies only to acts which, by the laws of this state, are forbidden to be done "by any corporation or association of individuals, without *express* authority of law." It does not apply at all to cases where only some particular corporation, or even a particular class of corporations, is forbidden by the laws of this state to do certain things,.

but only to cases where such prohibition is general, applying to all corporations and all associations of individuals, in this state.    It puts the foreign corporations, in all the enumerated particulars, upon the same footing as domestic corporations are placed by those state laws, and *those only,* which apply *generally to all* the corporations in the state, but not as some particular corporation or class of corporations may be placed by some law specially applicable to them.

This again is, I think, the proper and generally recognized measure of state comity.    A subsequent section makes provision for attachment against foreign corporations. These are all the provisions to be found in our statutes, at the time of this conveyance, having express reference to foreign corporations, which have any possible bearing upon the question here involved.

If we look to the several separate acts of incorporation in force at the time, and endeavor to extract from them a legislative policy in reference to our own domestic corporations, as to the power or capacity in question, we shall find that, owing to the great variety and dissimilarity of the several acts in this respect, no reasonably certain or satisfactory conclusion can be drawn ; and no court can safely declare a state or legislative policy upon grounds so utterly unstable and conjectural.    Some of these acts gave express power to take and dispose of real and personal estate without any restriction whatever, leaving them exactly upon the same footing as corporations at common law ; others allowed them to hold and dispose of real estate up to a certain amount in value ; others limited the right by the quantity of acres ; some of them restricted the right to such lands as might be required for the proper corporation buildings and such as might be taken or conveyed to it in payment, satisfaction or security for debts due the corpora-. tion ; some neither expressly gave or restricted the power

to take lands, and left the corporation with all the common-law incidents in this respect; and others were very restrictive in confining the right to such lands only as were used in the exercise of their corporate franchises. Under many of them, perhaps most of them, the right to take lands in payment of debts in good faith accruing to the corporation in the prosecution of their business, would be very clear; since this would follow as an incident to any corporation, unless in some way restrained by the charter. It may be true, as a general observation, that the railroad charters granted in the state were more restrictive, in this respect, than those of several other species; but, as I have already shown, so far as material to the question of comity, and what rights of *foreign* corporations are to be recognized, no distinction in principle can be made between railroad, and other, corporations: and if the latter have been made more restrictive, as an average, it has been for reasons foreign to the question here involved.

Bearing in mind the great variety and discrepancy, in this respect, in the great number of separate charters or acts of incorporation, as well those granted prior, as those subsequent, to *chapter 55, of the Revised Statutes of 1846*, let us examine the seventh section of the chapter, remembering, however, that it was not competent for the legislature, by these general provisions, to take away from any previously existing corporation any corporate right granted by the charter, and that it was equally incompetent, by any of these provisions, to tie the hands of future legislatures, should they see fit to make any different provisions either in a special charter or by general law. *Section seven*, which, by its context, applies generally to all corporations, created or to be created, in this state, declares: "Every such corporation may hold land to an amount authorized by law, and may convey the

same." There is no possible view in which this provision was *necessary* for *any* purpose. But we are bound so to construe it, if possible, as not to make it pure nonsense. This provision, of itself, neither gives nor takes away any power whatever. It merely recognizes such powers as any such corporation then had, or might thereafter have, "by law." If, by the terms, "may hold land to an amount authorized by law," we are to understand such lands only as, by *express provision of statute*, they were authorized to hold, then, it has no possible force or operation whatever, and its insertion was sheer nonsense; for, in such case, the corporation would take their authority from the statute conferring it, and not from *this general* provision, which can neither add to, nor take from, its force; and, upon this theory of interpretation, no possible object could have existed for its enactment. When a statute expressly confers a right, it does not need another statute to declare, or to give it, its effect. But if the term, "authorized by law," were intended to include those incidental powers or rights to hold lands, which result, as common-law incidents, from the creation of a corporation, without being expressed, so far as such incidents were not restrained by the legislature; then, though the statute was not necessary, it is not so purely nonsensical as it would be upon the other interpretation; as it may be treated as a declaratory statute merely. It is in this sense, and this only, that it can have any supposable or possible effect upon, or application to, the various corporations then existing, or thereafter to be created. In effect, therefore, when applied to such corporations, in the light of the existing statutes and the common law, the provision is nothing more than a declaration, that corporations might hold and convey lands, wherever this common-law right was in no way restrained by the legislature.

I find no other statute, then in force, which can have any possible bearing upon the question. The legislature have, in no respect material to the present case, adopted any policy, or enacted any statute, modifying the generally received doctrine of comity. And I think the company had the capacity to take, and did take, the title to the lands, and that their deed, with that of McCullough, the mortgagee and trustee, conveyed the title to the plaintiff; that the court erred in charging to the contrary, and that the judgment should be reversed, with costs, and a new trial awarded.

COOLEY, J., concurred.

CAMPBELL, J.

I agree with the circuit judge, that no title ever existed in the Indiana corporation under which plaintiff claims. I do not regard the collateral questions, arising in the cause, as of much consequence, and shall assume, without discussing any of them, that this railroad company had all the right to take the lands in question that the state of Indiana could give it. Taking this for granted, I think it has no right whatever, under the laws of Michigan, which is the only state whose laws have, in my opinion, any important bearing on the controversy.

The only authority which any one has ever relied upon to justify the recognition of rights of foreign corporations to hold lands, is the entirely vague and undefined idea of what is spoken of as comity. Whatever this word may properly include within its meaning, it is only another way of expressing what may be more properly classed as private international law. No court or jurist would venture to suggest that there is any claim which is not dependent upon settled law. When courts hold certain things as

within the protection of comity, they can only mean that the law of the land, bearing upon such matters, sustains the right. There is no legal distinction between these rights and any others. When asserted, it is not in the discretion of courts, whether or no they shall be protected. A right, once existing, cannot be divested or denied. The creation of new privileges can only be by positive legislation. If this company's title is to be recognized, it can only be because it was a right acquired under common, or statute, law, and beyond the divesting power of any branch of the government.

There is no foundation for any claim that the law of Indiana can have force in any other state. If there is any right here, it can only depend on the constitution and laws of the United States, or those of the state of Michigan. It is not claimed that there is any thing, in the case before us, dependent upon the authority of the United States. The common, or statute, law of Michigan alone, must decide the cause. Natural citizens of another state, have the same rights here that our own citizens have, but they cannot import into this state any rights that our citizens do not have here. We recognize many relations created elsewhere, but we do not allow persons, in those relations, to set up any rights, when they come here, which differ from the rights attendant on similar relations, existing here. If marriage in another state, gives personal authority, or property interests, different from ours, the married persons coming here to reside, cannot exercise those privileges. If it subjects persons elsewhere to different disabilities, they are emancipated when they come here. And whatever character the laws of another state may affix to an artificial person, that character, if respected here, is respected, not because of the foreign law, but because of our own law; as the canon law, so far as it was in force in

England, derived all of its authority from the laws of the realm.

As most of the decisions which have recognized any right in foreign corporations to become land owners, rest it upon a supposed analogy to other rights universally recognized, it will not be out of place to refer to those which have been supposed to furnish the best support to the doctrine. The number of decisions distinctly asserting the right upon a state of facts calling for a decision, is not very great. But there are some such cases.

We shall escape some confusion by keeping in mind some peculiarities especially belonging to this subject. Corporate existence is by universal law regarded as a franchise, which can never exist except by a positive authority. Accordingly, a corporation, as such, can never have corporate existence outside of the state which grants or confirms that franchise. And when two governments concur in granting the power or confirming it, the existence in each state is recognized to depend on its laws alone, the foreign law having no force except by adoption. And it is the settled law of Michigan, that a corporation may be confined to a smaller range, and that, if its corporate existence is fixed by its charter in a city or town, any attempt to exercise elsewhere those powers which are essential corporate franchises will be illegal and subject it to forfeiture.—*People v. Oakland Co. Bank, 1 Doug., 282.*

The acts which a corporation may do are not necessarily separate franchises. Some of its business may be peculiar, and some of its powers may in themselves be franchises, which no one, whether an individual or a corporation, can exercise without state permission. On the other hand, most of its business is usually such as any one can do if he pleases, and as to such business a corporation stands precisely on the same footing with a private person.

25 mich.—31.

It may be said without any question that no franchise can be exercised any where without the distinct authority of the government within whose bounds it is exercised. And it is generally true that any thing which does not involve the exercise of a franchise, is possible every where to corporate as to private business, where it can be done by agents and does not involve corporate presence. This rule is not universal, but it is general enough to illustrate most of the questions involved in the decisions alluded to.

It has always been competent, as a matter of common law, for foreign corporations, public and private, to sue in the courts of law and equity. It has always been understood that they may deal in personal property and securities, where there are no restraining acts. The general doctrine, that personalty follows the person, has been applied to their transactions; and as such dealings can always be done through agents, or correspondence, they are in no way affected by corporate residence. But this rule has never been so extended as to allow the corporate residence to be changed, so as in law to bring the corporation itself, with its franchises, into another jurisdiction, without a new franchise from the authority of that new domicil.

There is no process known to the common law, whereby personal jurisdiction can be gained over a foreign corporation, against its consent. Such a corporation could not be divested of its corporate powers, by any foreign forum; and the effect of giving it plenary powers of action, would be to confer privileges much beyond any that could be given to a domestic corporation. No system of law, which is at all familiar among any people we are connected with, has gone far enough to allow any franchises to be asserted, except by those who can be controlled in their exercise.

To draw from the general acquiescence in the right of foreign corporations to sue and deal in personal estate, a

right to enjoy real estate also, is a fallacious inference, unless realty and personalty stand on the same footing. Whatever any one may feel disposed to regard as policy in this matter, cannot concern the law of the land. That is the only thing which is to guide us. And if the law does not put these powers together, and infer one from the other, the decisions resting on that supposed analogy, are entirely unfounded, and the doctrine must fail unless some other support can be found for it.

Another consideration is also to be borne in mind. There is no room nor authority for any arbitrary distinctions between corporations. If the doctrine is to be applied to any, it must extend to all. The common law recognized no corporation, public or private, as incapable of owning lands. And if the authority is not to be sought in our own legislation, or, in other words, if it exists unless prohibited by our laws, then it has no limits in character or in quantity. Foreign states and sovereigns, and foreign municipal and religious bodies, would stand on the same footing, in this respect, with railroads or banks.

No legal difference can exist between the corporations of another state and those of foreign countries. Corporations of sister states have not the civil position of citizens, so as to give them any rights here, unless we choose to give them. Very probably, if there were legislation on the subject, a difference would be made, but the courts can make none.

Neither can it make any difference in law, whether the foreign corporation has any power to hold lands at home. This will not prevent it from holding abroad. It is no uncommon thing for corporations to be created by one jurisdiction, for the very purpose of doing business in some other country, whose laws will permit it. One of the few foreign corporations, permitted by our laws to take lands here, was organized by the state of New York, with our

consent, to build the Sault canal, with powers which we could not have conferred, under our constitution, except by general law.    The Virginia company, the South Sea, Hudson Bay, and East India companies, organized in England, to act in distant regions, not all under the domain of Great Britain; the Panama and Nicaragua transit companies; the numerous mining companies, organized under English and French laws, and under the laws of some of our own states, to mine for the precious metals, and coal, and other minerals, in other jurisdictions willing to receive them, have, in some, if not in all cases, been debarred from any holdings at home like those abroad.    The same is true in regard to the factories in the Levant, and in other partly civilized countries.    If a company should be formed in another state or country, for the express purpose of dealing in land here, it could assert its rights, beyond any controversy, on the same principle with any other foreign corporation, unless a statutory distinction should be created.

I think it would be impossible to draw any rule from the charters of our own corporations, which would enable us to determine what was the general policy of the state, even as to them.    I do not conceive that, if we could do so, it could be extended to foreign corporations. But any one, who will examine our charters and statutes, must see that the only rule we can deduce is, that each has just such power as is given to it, and no other.    Some corporations have no power to take lands.    Some can take for their offices and buildings.    Some can take for extended mining, lumbering, and other business operations.    Some can take in payment of debts, and some have no such power granted.    I think the key to the whole powers of our own corporations is to be found in *Comp. L.*, § *2149*, which declares that every corporation "may hold land to an amount authorized by law."    If this does not mean the statutes and charters of the state, it means noth-

ing; for at common law the power was plenary, and without limit. Our doctrine, certainly, is not understood to leave them without very great restrictions.—*Bank of Michigan v. Niles, 1 Doug., 401.* The corporation must, in all cases, be prepared to show its authority to take realty. Having shown it, all presumptions will be made that particular estates fall within it, unless repugnant.

I do not know of any legal reason which should make the capacity of foreign corporations to take land here, depend at all on any analogies of our own. I cannot conceive that any right of that importance can depend on analogy at all. It must, as already intimated, be a pure question of positive law.

Our law, as before stated, is all common, or statute law. We have no statute law which covers the case before us. Our constitution and statutes were designed to regulate our own corporations. There are several statutes, under which foreign corporations can hold, but none in point here. How, then, does the case stand at common law?

There is nothing in any original common-law authority, discovered as yet by any one, which recognizes the power of a foreign corporation to take land. It has generally been understood, and such is the language of the writers on corporations, that the power to take land in a corporate capacity, is itself a franchise; and the reason of this is, that changes by death or otherwise, among the corporators, create a title by succession, entirely different from any private holding. And no franchise can exist without grant from the sovereignty.

But the nature of land titles is quite as plain and distinct a reason why no such power can be inferred. There is no trace, anywhere, among respectable authorities, of any general extension of what are called the rules of comity to estates in land. Since the adoption of our registry system there is more, rather than less, reason for strictness,

because persons searching the record, and finding claims of foreign corporations, could never be able to know their legal rights, by any means attainable in our own territory. These estates are always governed by positive law, and each state has its own land laws, according to its own notions. In one thing all common-law governments have agreed, and that is, that no estate in land can devolve on any but citizens, or subjects, except by virtue of statutes changing the common law. The constitution of the United States has put citizens of the several states on one footing, but it has given no such privilege to corporations. A corporation of another state, therefore, is not entitled to any of the rights of a natural or artificial citizen, so far as this matter is concerned, and stands as an English or French corporation would, with no such rights at all, unless conferred by statute.

I do not care to discuss the policy which I may think, and which others may not think, should govern our legislation. It is fortunate the question has been raised, for it must now be determined whether foreign corporations shall have plenary, or limited power, or no power at all, given to them to take and hold lands in this state; and as the attention of the authorities is now called to it, some action will doubtless be taken.

But, until there is legislation, I am unable to satisfy myself that any such corporation can be recognized as a source or holder of title. The cases which have been before our courts have never presented any such question. Some of them have been decided by us while this very case has been pending here, awaiting re-argument before us at our invitation. They have no weight at all for any of the purposes of this controversy.

I regret that I cannot concur in the conclusions of my brethren. I have indicated in a very general way the views I entertain on the single question of corporate capacity.

A discussion of the few authorities to be found in point, would not throw much light upon the subject, as they are far from uniform, and all based upon analogies which, as I have already intimated, do not seem to me admissible. It is more important, in the confusion which exists, to bring the question into notice for legislative consideration, than to discuss it in all its bearings.

GRAVES, J., did not sit in this case.